# United States Court of Appeals for the Federal Circuit

_____

**KING SUPPLY COMPANY, LLC
(DOING BUSINESS AS KING ARCHITECTURAL
METALS),**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant,*

**and**

**TUBE FORGINGS OF AMERICA, INC.,**
*Defendant-Appellant,*

**and**

**WELDBEND CORP.,**
*Defendant-Appellant,*

**and**

**HACKNEY LADISH, INC.,**
*Defendant.*

_____

2011-1252, -1253

_____

Appeals from the United States Court of International Trade in case no. 09-CV-0477, Senior Judge R. Kenton Musgrave.

_____

Decided: March 27, 2012

_____

THOMAS V. VAKERICS, Barnes, Richardson & Colburn, of Washington, DC, argued for plaintiff-appellee. With him on the brief was STEPHEN W. BROPHY.

LAWRENCE J. BOGARD, Neville Peterson LLP, of Washington, DC, argued for defendant-appellant Tube Forgings of America, Inc. With him on the brief was MEREDITH A. DEMENT.

JEFFERY C. LOWE, Mayer Brown LLP, of Washington, DC, argued for defendant-appellant Weldbend Corp. With him on the brief was SIMEON M. KRIESBERG.

---

Before RADER, *Chief Judge*, and BRYSON and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

Weldbend Corp. ("Weldbend") and Tube Forgings of America, Inc. ("Tube Forgings") appeal the decision of the Court of International Trade ("Trade Court") reversing a scope ruling by the U.S. Department of Commerce ("Commerce"). The Trade Court concluded that King Supply Co.'s ("King") imports of steel butt-weld pipe fittings were outside the scope of an antidumping duty ("AD") order, reasoning that the AD order was restricted to pipe fittings used in piping systems, whereas King's pipe fittings are used only in structural contexts. Because the Trade Court gave inadequate deference to Commerce's scope ruling that the antidumping duty order did not contain such an end-use restriction,[1] we reverse.

## I.  BACKGROUND

Generally, whenever domestic producers of a particular product believe that imports of certain competing

---

[1]    End-use restrictions, which generally limit the scope of antidumping duty orders based on the ultimate usage of the imported merchandise, are sometimes also referred to as end-use exclusions or end-use requirements.

goods are being sold in the United States at less than fair market value (i.e., being "dumped"), they may petition Commerce to impose antidumping duties on the imports of the goods. *Walgreen Co. v. United States*, 620 F.3d 1350, 1351 (Fed. Cir. 2010). If Commerce finds a petition sufficient, Commerce initiates an investigation to preliminarily determine if there is a reasonable basis to conclude that dumping is occurring or is likely to occur. 19 U.S.C. §§ 1673a, 1673b(b)(1)(A). Concurrently, the U.S. International Trade Commission ("ITC") investigates whether there is a reasonable indication that a domestic industry of like products is or is likely to be materially injured by virtue of the dumped imports. *Id.* § 1673b(a)(1)(A). If the respective investigations result in final determinations of dumping and material injury or threat of material injury, Commerce issues an AD order imposing antidumping duties on the appropriate imported merchandise. *Id.* § 1673d(c)(2). While petitioners and other interested parties in the investigation may propose the scope of merchandise to be investigated, Commerce alone defines the scope of the AD order.

After an AD order is issued, Commerce is often called upon to issue "scope rulings" to clarify the scope of the AD order and determine whether particular products are included within its scope. *Walgreen,* 620 F.3d at 1352 (quoting 19 C.F.R. § 351.225(a)). In making such scope rulings, while the plain language of the AD order is paramount, Commerce must also take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary [of Commerce] (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1); *Walgreen,* 620 F.3d at 1357.[2] Consequently, a scope

---

[2] In the event that examination of these criteria is not dispositive, the Secretary must look to additional factors such as the physical characteristics of the product, the expectations of consumers, and the channels of trade by which the product is sold. 19 C.F.R. § 351.225(k)(2).

ruling is a highly fact-intensive and case-specific determination.

A.  The Original Petition and Antidumping Duty Order

In 1991 certain domestic producers submitted an antidumping duty investigation petition to Commerce and the ITC with respect to imports of butt-weld pipe fittings from China and Thailand (the "Petition").  The leading paragraph in the "product description" section of the Petition identified products subject to the investigation in terms of their physical characteristics ("carbon steel butt-weld fittings having an inside diameter of less than 360 millimeters," and satisfying certain American Society for Testing and Materials ("ASTM") and American National Standards Institute ("ANSI") industry standards for materials and dimensions), and went on in subsequent paragraphs to describe how butt-weld pipe fittings are generally made, used, and sold.  JA261-62.[3]  For example, the second paragraph of the Petition explained that "butt-weld fittings are forged steel products used to join pipe sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings)."  *Id.*

On May 18, 1992, Commerce issued a final affirmative determination that the products at issue were indeed being dumped.  *Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China,* 57 Fed. Reg. 21,058 (May 18, 1992).  This final determination included a description of the subject products tracking the language used in the first two paragraphs of the Petition:

In this case, neither party contends that such additional factors need to be considered, and so we do not address such factors.

[3]  Citations to "JA__" refer to the parties' Joint Appendix.

> The products covered by this investigation are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.,* threaded, grooved, or bolted fittings).

*Id.*[4]

In June 1992, the ITC concluded that the domestic industry was materially injured by virtue of the dumped imports. *Carbon Steel Butt- Weld Pipe Fittings from China and Thailand*, Invs. Nos. 731-TA-520 and 521, USITC Pub. 2528 (Int'l Trade Comm'n June 25, 1992) ("*ITC Final Determination*"). The ITC explained that "the like product is all domestically produced carbon steel butt-weld pipe fittings having an inside diameter of less than 14 inches, whether finished or unfinished." *Id.* at 4, 5, I-16. The ITC's investigation also revealed that in addition to their use in piping systems to convey gases or liquids in various contexts, the butt-weld pipe fittings at issue were also used in "structural applications" as support members, including in "fences, guardrails, playground equipment, and scaffolding." *Id.*

In July 1992, Commerce issued an AD order imposing antidumping duties on the subject merchandise, mirror-

---

[4] Commerce's notice of initiation of the investigation and its preliminary determination used essentially the same language when describing the scope of the investigation. *Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt- Weld Pipe Fittings From the People's Republic of China*, 56 Fed. Reg. 27,730 (June 17, 1991); *Preliminary Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China,* 56 Fed. Reg. 66,831 (Dec. 26, 1991).

ing the operative language from Commerce's final determination:

> The products covered by this order are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).

*Certain Carbon Steel Butt-Weld Pipe Fittings from China*, 57 Fed. Reg. 29,702-03 (July 6, 1992) ("*AD Order*").

### B. King's Imported Products and Commerce's *Scope Ruling*

In March 2009, King requested that Commerce issue a scope ruling that butt-weld pipe fittings imported by King from China are outside the scope of the *AD Order*. King's request indicated that its imported butt-weld pipe fittings are physically identical to those subject to the *AD Order*. JA908, JA913 ("The physical characteristics of the subject merchandise and King Architectural's imports are the same."). King argued that the second sentence of the *AD Order* was an end-use restriction that "expressly limits the scope [of the *AD Order*] to pipe fittings used to join sections of piping systems." JA910. By contrast, King's imported butt-weld pipe fittings were "for structural use in applications such as handrails, fencing, and guardrails." JA908.

Commerce issued its scope ruling on October 21, 2009, concluding that King's imports were included within the scope of the *AD Order*. *Final Scope Ruling: Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("PRC")*, Scope Inquiry No. A-570-814 (Oct. 20, 2009) (the "*Scope Ruling*"); JA1187-93. Commerce emphasized that not only were King's

products physically identical to the products described in the first sentence of the *AD Order*, but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition. *Scope Ruling*, at 5; JA1192. Commerce found further support in the ITC's final determination, which defined the domestic like products as including "*all* pipe fittings having an inside diameter of less than 14 inches, whether finished or unfinished *regardless of use*." *Id.* at 5-6; JA1192-93 (emphases added).

Commerce rejected King's arguments that its products were outside the scope of the *AD Order* because they were not "used to join sections in piping systems," explaining that the second sentence was not an end-use restriction but merely a statement that "distinguished butt-welding from other types of fastening methods." *Id.* at 5; JA1192. Commerce elaborated as follows:

> Specifically, we find that this sentence uses piping systems as an example of an instance where a permanent, welded connection is desired. We find that the language "are used" does not mean that the use identified is necessarily the exclusive use. Thus, we conclude that the second sentence does not contain an end-use exclusion, but a description of a possible end-use.

*Id.* Accordingly, Commerce concluded that King's pipe fittings were subject to the *AD Order*. *Id.*

King challenged the *Scope Ruling* at the Trade Court, continuing to contend that the second sentence of the *AD Order* is an end-use restriction which places King's products outside of its scope. The Trade Court agreed with King, focusing on the *AD Order* language "[t]hese formed or forged pipe fittings are used to join sections in piping systems," and finding that "[t]he Order describes *the* use (one and only one use) of pipe fittings subject to the scope of the investigation. No other use is described. As so described, it amounts to an exclusive use." *King Supply*

*Co. v. United States*, No. 09-00477, 2010 Ct. Int'l Trade LEXIS 112, at *7 (Sept. 30, 2010) ("*CIT Op.*") (emphasis in original). According to the Trade Court, the second sentence of the *AD Order* could not be reasonably read as merely noting an example of an end-use for the subject merchandise, since "[t]he reference to use in piping systems does not indicate, for example, a qualification of 'for example,' 'e.g.,' 'such systems as,' 'chiefly used,' 'principally used,' 'capable of being used,' or any other such similarly expansive signal." *Id.* at *8. Although the Trade Court thus found the meaning of the *AD Order* plain, even looking beyond the four corners of the *AD Order*, the Trade Court stated that it "was unable to find evidence to support Commerce's interpretive conclusion." *Id.* at *15.

Accordingly, the Trade Court vacated the *Scope Ruling* and remanded to Commerce to issue a determination that King's butt-weld pipe fittings are excluded from the scope of the Order. *Id.* at *18-19. Commerce obliged, and on remand construed the *AD Order* to exclude King's pipe fittings used in structural applications. JA824-25 ("*Scope Ruling II*"). The Trade Court sustained Commerce's redetermination and entered final judgment. Weldbend and Tube Forgings, two domestic producers of butt-weld pipe fittings who had intervened before the Trade Court, appealed to this court, contending that Commerce's *Scope Ruling* was correct and should have been affirmed by the Trade Court.

## II. DISCUSSION

In reviewing the Trade Court's decision on the *Scope Ruling*, "we step into the shoes of the [Trade Court] and apply the same deferential 'substantial evidence' standard of review that it applied to its review of Commerce's determination." *Walgreen*, 620 F.3d at 1354 (citation omitted). We must therefore uphold Commerce's determination unless the *Scope Ruling* is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders. *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). This deference is appropriate because the meaning and scope of antidumping orders are issues "particularly within the expertise" and "special competence" of Commerce. *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998). We have noted that "[a] party challenging [Commerce's] determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)). Indeed, "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). This broad deference is not unlimited, however, since "Commerce cannot interpret an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Walgreen*, 620 F.3d at 1354 (citations and internal quotation marks omitted).

### A.  Commerce's *Scope Ruling* Reasonably Interpreted the *AD Order* to Not Include an End-Use Restriction

End-use restrictions in AD orders, while appropriately utilized in certain cases, are disfavored because they can be difficult to enforce. This is because the physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation. Accordingly, when Commerce intends to impose end-use restrictions, Commerce consis-

tently uses express terms such as "only" or "solely" to indicate restrictions on end uses for certain products. *See*, *e.g.*, *Live Swine from Canada,* 70 Fed. Reg. 12,181, 12,182 (Mar. 11, 2005) (Countervailing Duty Order) (excluding swine "being used for breeding stock only"); *Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36,070, 36,071 (May 22, 2002) (Countervailing Duty Order) (excluding softwood lumber products that are "used solely" for certain single family home construction); *Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan*, 62 Fed. Reg. 32,584 (June 16, 1997) (AD order) (covering "only those [turbo-compressor systems] used in the petrochemical and fertilizer industries"). In its opinion, the Trade Court acknowledged that "Commerce has apparently described usage with more precision and specificity in other contexts when including or excluding products from the scope of an antidumping duty order." *CIT Op.* at *8.

We hold that end-use restrictions do not apply to AD orders unless the AD order at issue includes clear exclusionary language. The requisite clear exclusionary language must leave no reasonable doubt that certain products were intended to be outside the scope of the AD order based solely on the end use of those products. Such language being absent from the *AD Order* in this case, we cannot deem unreasonable Commerce's determination that the *AD Order* fails to give rise to an end-use restriction.

Here, the *AD Order* specifies the physical characteristics of all pipe fittings covered by it, then states that the fittings "are used" in a certain exemplary context. This language is reasonably understood as exemplary and not absolute, despite the absence of more direct qualifiers that could have been included in the *AD Order* such as "for example" or "principally used," as the Trade Court would require. For example, some cups "are used" to hold liquids, but also "are used" to hold pencils. While these

examples shed light on the functional capabilities of the cups, they do not necessarily preclude other uses for such cups. The phrase "are used" alone does not compel a reading of an exclusive end-use, and it does not render a reading of an exemplary use unreasonable or outside the scope of Commerce's broad authority to interpret its own AD orders.

In *Wheatland Tube Co. v. United States*, this court upheld Commerce's scope ruling that an antidumping order excluded certain kinds of pipe regardless of actual use. 161 F.3d 1365, 1368 (Fed. Cir. 1998). The scope of the orders at issue in *Wheatland* provided in part that "[s]tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe *of a kind used* for oil and gas pipelines is also not included in this investigation." *Id.* at 1367 (emphasis added). Wheatland, a domestic producer, argued that the phrase "of a kind used for" excluded only line pipe that was actually used for oil and gas pipelines. *Id.* at 1369. This court upheld Commerce's rejection of that argument, finding that it "contradict[ed] the unambiguous language of the Orders, which refers to the pipes' principal use at the time of entry instead of actual use." *Id.* As in *Wheatland*, we decline to read any perceived ambiguity in the *AD Order* to construe a stated exemplary use as an exclusive use, particularly where Commerce reasonably interpreted the *AD Order* otherwise.[5]

The Trade Court placed undue emphasis on the phrase "are used . . . in piping systems" to the exclusion of the remainder of the second sentence of the *AD Order*, which delineates between different kinds of fastening

---

[5] The orders in *Wheatland* also expressly stated that the line pipe at issue was "not included" in the resulting orders, providing another instance in addition to those discussed above where Commerce used clear exclusionary language (e.g., "only" or "solely") that is absent in the *AD Order*.

methods and their suitability for certain applications. Commerce understood the second sentence of the *AD Order* as merely a mention of "piping systems as an example of an instance where a permanent, welded connection is desired." *Scope Ruling*, at 5; JA1192. In essence, Commerce concluded that "the second sentence distinguishes butt-welding from other types of fastening methods" such as threaded, grooved, or bolted fittings. *Id.* The plain language of the *AD Order* is entirely consistent with Commerce's interpretation that piping systems are included as an example of a suitable application for permanent, welded connections obtainable via butt-weld pipe fittings. When read in this manner, the "are used . . . in piping systems" language is not an end-use restriction, but is informative and non-superfluous.

B.  The Considerations Under 19 C.F.R. § 351.225(k)(1) Support Commerce's *Scope Ruling*

Commerce's *Scope Ruling* is also supported by substantial evidence in view of its considerations under 19 C.F.R. § 351.225(k)(1), which provides that "in considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account . . . [t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."

The second sentence of the *AD Order* language tracks the key language from the second paragraph of the Petition exactly. *Compare AD Order, with* Petition (JA903) (referring in both cases to butt-weld pipe fittings being "used to join pipe sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)"). In context, the Petition further explains this language by noting that finished butt-weld pipe fittings share common physical

characteristics such as beveled edges to facilitate welding the fittings to the pipes for more permanent connections. JA903. Thus, the "used to join pipe sections in piping systems where conditions require permanent, welded connections" language in the *AD Order* is best understood as likewise being intended to distinguish physical characteristics and capabilities of the subject pipe fittings, rather than specify an exclusive end-use. Indeed, the ITC's investigation expressly noted the use of the subject pipe fittings in a variety of contexts, including structural applications for which King alleges its pipe fittings are used (i.e., fences and guardrails), clearly indicating that the ITC did not consider piping systems as the sole end-use for the subject pipe fittings.

King's products undisputedly satisfy the physical description of the products provided in the first sentence of the *AD Order*—they are "carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form." King's products also possess other physical attributes indicated in the original Petition, such as compliance with the specified ASTM and ANSI standards for materials and dimensions. Commerce even found that King's pipe fittings "create permanent, welded connections and meet required chemical composition, heat number, and physical characteristics to be used in piping systems." *Scope Ruling*, at 5; JA1192. The domestic products and King's imports have the same classifications under the Harmonized Tariff Schedule of the United States ("HTSUS"). Because King's pipe fittings satisfy the physical characteristics of the pipe fittings in the *AD Order*, and because the *AD Order* was reasonably interpreted by Commerce to include no end-use restrictions, Commerce's *Scope Ruling* was supported by substantial evidence and the Trade Court erred by substituting its interpretation of the *AD Order* for that of Commerce.

Lastly, none of this court's precedent relied upon by the parties or the Trade Court mandates a different

result.  First, this case is different from that in *Eckstrom Indus., Inc. v. United States,* which involved similar butt-weld pipe fittings but otherwise very dissimilar facts.  254 F.3d 1068 (Fed. Cir. 2001).  Although the AD order in *Eckstrom* referred to "certain stainless steel butt-weld pipe fittings," the word "certain" alone does not create an end-use restriction.  *Id.* at 1070.  On its face, the anti-dumping order in *Eckstrom* stated no fewer than five conditions of use for the subject merchandise.  *Id.*  The central issue in *Eckstrom* was not whether the AD order included an end-use restriction, but whether certain cast pipe fittings, as opposed to wrought pipe fittings, were within the scope of the antidumping order.  *Id.* at 1070-71.  We concluded that cast fittings were outside the scope of the AD order because: (1) the petition was clearly directed to wrought fittings only, citing to wrought fitting industry standards and describing manufacturing proc-esses inapplicable to cast fittings; (2) the ITC's domestic industry investigation was directed to "formed or forged stainless steel products," which excludes cast fittings; (3) the ITC's investigation was directed to wrought fittings classifiable under HTSUS 7307.23.00, which does not encompass cast fittings; and (4) the order itself was directed to "welded" pipe fittings, which suggested that the subject fittings were better understood as wrought than cast.  *Id.* at 1074-76.  There are no such plainly exclusive indications in this case.

This case is also unlike *Duferco Steel Co. v. United States,* which involved a scope ruling in which Commerce interpreted the antidumping orders to include certain steel floor plates because "the petitions originally included these products" and "there [was] no language in the orders specifically excluding these products."  296 F.3d 1087, 1095 (Fed. Cir. 2002).  We reversed because Com-merce had impermissibly relied upon language in the petitions rather than the orders, to modify the scope of the orders by effectively importing a physical description of certain products that was not present in the text of the

order.  *Id.* at 1096-98.  We explained that "Commerce cannot find authority in an order based on the theory that the order does not deny authority."  *Id.* at 1096.  Here, the *Scope Ruling* properly clarified the scope of the *AD Order*—it did not change the scope of the order or alter its express terms as in *Duferco*.

IV. CONCLUSION

We find that Commerce's determination in the *Scope Ruling* was supported by substantial evidence, and that the Trade Court gave insufficient deference to Commerce in interpreting Commerce's own *AD Order*.  On the record before us, it was reasonable for Commerce to have read the second sentence of the *AD Order* as not constituting an end-use restriction.  Because Commerce was within its discretion to deem King's imported pipe fittings within the scope of the *AD Order*, we reverse the Trade Court's judgment to the contrary.

**REVERSED**