# United States Court of Appeals for the Federal Circuit

_____

**GLOBAL COMMODITY GROUP LLC,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**AND**

**ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND TATE & LYLE AMERICAS LLC,**
*Defendants-Appellees.*

_____

2012-1346

_____

Appeal from the United States Court of International Trade in No. 11-CV-0172, Judge Gregory W. Carman.

_____

Decided: March 7, 2013

_____

GEORGE W. THOMPSON, Neville Peterson LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was RUSSELL A. SEMMEL.

PATRICIA M. MCCARTHY, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States. On the brief were STEWART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, CLAUDIA BURKE, Assistant Director, and CARRIE A. DUNSMORE, Trial Attorney. Of counsel on the brief was MATT WALDEN, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel was JONATHAN M. ZIELINSKI.

DANIEL L. SCHNEIDERMAN, King & Spalding, LLP, of Washington, DC, argued for defendants-appellees, Archer Daniels Midland Company, et al. With him on the brief was JOSEPH W. DORN.

---

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Global Commodity Group LLC ("GCG") appeals the Court of International Trade's judgment, *Global Commodity Group LLC v. United States*, 825 F. Supp. 2d 1328 (Ct. Int'l Trade 2012) sustaining the Department of Commerce's ("Commerce") determination in Citric Acid and Certain Citrate Salts: Final Determination on Scope Inquiry for Blended Citric Acid from the People's Republic of China and Other Countries ("Final Scope Determination"), issued on May 2, 2011. In the Final Scope Determination, Commerce found the portion of GCG's merchandise consisting of citric acid from the People's Republic of China ("PRC")—approximately 35 percent—within the scope of the antidumping duty and countervailing duty orders on citric acid and certain citrate salts (citric acid) from the PRC. Because we owe significant deference to Commerce's own interpretation of scope

orders, and we find Commerce's interpretation of the scope order to be reasonable, we affirm the lower court's ruling.

BACKGROUND

In 2009, following a petition by defendant-intervenors-appellees Archer Daniels Midland Co., Cargill, Inc., and Tate & Lyle Americas (collectively, "Petitioners") and a related investigation, Commerce issued Citric Acid and Certain Citrate Salts From Canada and the People's Republic of China: Antidumping Duty Orders, 74 Fed. Reg. 25,703 (May 29, 2009) and Citric Acid and Certain Citrate Salts from the People's Republic of China: Notice of Countervailing Duty Order, 74 Fed. Reg. 25,705 (May 29, 2009) ("the Orders"). The Scope of the Orders section for each of the Orders states, in relevant part:

> The scope of this order includes all grades and granulation sizes of citric acid, sodium citrate, and potassium citrate in their un-blended forms, whether dry or in solution, and regardless of packaging type. The scope also includes blends of citric acid, sodium citrate, and potassium citrate; as well as blends with other ingredients, such as sugar, where the unblended form(s) of citric acid, sodium citrate, and potassium citrate constitute 40 percent or more, by weight, of the blend.

74 Fed. Reg. at 25,703, 25,705.[1]  GCG's merchandise at issue consists of 35% citric acid from the PRC and 65%

_____

[1] The remainder of the scope description states:
    The scope of this order also includes all forms of crude calcium citrate, including dicalcium citrate monohydrate, and tricalcium citrate tetrahydrate,

citric acid originating from other countries. On July 26, 2010, GCG requested a determination from Commerce, pursuant to 19 C.F.R. § 351.225(c) that its merchandise falls outside the scope of the Orders as a "blend" under the second sentence of the scope language quoted above where the unblended form of Chinese citric acid constituted less than 40%, by weight, of the blend.

Commerce instituted a scope inquiry in November 2010 and issued its Preliminary Determination on March

which are intermediate products in the production of citric acid, sodium citrate, and potassium citrate. The scope of this order does not include calcium citrate that satisfies the standards set forth in the United States Pharmacopeia and has been mixed with a functional excipient, such as dextrose or starch, where the excipient constitutes at least 2 percent, by weight, of the product. The scope of this order includes the hydrous and anhydrous forms of citric acid, the dihydrate and anhydrous forms of sodium citrate, otherwise known as citric acid sodium salt, and the monohydrate and mono-potassium forms of potassium citrate. Sodium citrate also includes both trisodium citrate and monosodium citrate, which are also known as citric acid trisodium salt and citric acid monosodium salt, respectively. Citric acid and sodium citrate are classifiable under 2918.14.0000 and 2918.15.1000 of the Harmonized Tariff Schedule of the United States ("HTSUS"), respectively. Potassium citrate and crude calcium citrate are classifiable under 2918.15.5000 and 3824.90.9290 of the HTSUS, respectively. Blends that include citric acid, sodium citrate, and potassium citrate are classifiable under 3824.90.9290 of the HTSUS. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise is dispositive.

7, 2011. In that determination, Commerce rejected GCG's argument that the term "other ingredients" in the scope language referred to any product other than subject citric acid. Rather, Commerce found that the "scope intentionally breaks blends of citric acid and blends with other ingredients out into separate clauses, and only applies the 40 percent threshold to the latter." J.A. 34. Because GCG adds only non-subject citric acid to the subject citric acid, Commerce recommended that GCG's product be considered a blend of citrate products under the first clause of the second sentence rather than a blend with other ingredients meeting the specified exclusion. Commerce also rejected GCG's argument that its product was substantially transformed in a third country through the blending process and recommended that duties be assessed on GCG's product "according to the rates applicable to citric acid from both the PRC and any other country represented in the blend, based upon the quantity and value of citric acid from each country included in the blend." J.A. 39. If the percentage of subject and non-subject citric acid could not be accurately determined for GCG's product, then antidumping and countervailing duties would be assessed based on the highest rate applicable to its constituent sources.

In the Final Scope Determination, issued May 2, 2011, Commerce affirmed the findings of the Preliminary Determination and recommended that the portion of GCG's product originating from the PRC be subject to the scope of the Orders and that GCG's product be assessed duties according to the amount of PRC citric acid contained in the product. Commerce altered its reasoning, however, and recommended that GCG's product not be considered a "blend" within the meaning of the Orders. Rather, Commerce found that GCG's product "is commingled citric acid, and for all intents and purposes, commingled citric acid is still just citric acid. Functionally and chemically, it is indistinguishable from citric acid that

comes from a single source." J.A. 44. Thus, according to Commerce, the first sentence of the scope language from the Orders quoted above—relating to unblended citrate products—covers GCG's product. Noting that the Harmonized Tariff Schedule of the United States ("HTSUS") treats commingled citric acid differently from blends that include citric acid, sodium citrate, and potassium citrate, Commerce found that "GCG cannot have it both ways: if its product is not a blend under the first clause of the second sentence of the scope because of the scope's HTSUS references, it also cannot be a blend under the second clause of that sentence that references blends with other ingredients, since the same HTSUS number applies to the entire sentence." J.A. 45. Commerce therefore recommended that duties be applied to GCG's product according to the methodology outlined in its Preliminary Determination.

GCG commenced an action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) in the Court of International Trade challenging Commerce's Final Scope Determination. The court framed the dispute as "whether Plaintiff's product is a blend, and specifically . . . whether non-subject citric acid must qualify as 'other ingredients' within the meaning of that clause." *Global Commodity Group*, 825 F. Supp. 2d at 1330. As it did below, GCG contended that "other ingredients" must be interpreted to mean any ingredient other than subject citrates in contrast to Commerce's conclusion that "other ingredients" refers to non-citrate products. *Id.* Finding that "Commerce's interpretation of the phrase 'other ingredients' is not only permissible, it is eminently reasonable," the court held that Commerce's interpretation: 1) is not contrary to the terms of the scope; 2) does not alter the language of the scope; and 3) must be sustained in light of the significant deference owed to Commerce in interpreting scope provisions. *Id.* at 1331. The Court of International Trade therefore sustained Commerce's determination that the portion of

GCG's product originating from PRC falls within the scope of the order and is subject to the corresponding duties. *Id.*

GCG timely appealed and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I.

Domestic producers of a particular product that "believe that imports of certain competing goods are being sold in the United States at less than fair market value (i.e., being 'dumped') . . . may petition Commerce to impose antidumping duties on the imports of the goods." *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012) (citing *Walgreen Co. v. United States*, 620 F.3d 1350, 1351 (Fed. Cir. 2010)). Commerce will then initiate an investigation to preliminarily determine if there is a reasonable basis to conclude that dumping is occurring or is likely to occur. 19 U.S.C. §§ 1673a, 1673b(b)(1)(A). The U.S. International Trade Commission will concurrently investigate whether there exists a reasonable indication that a domestic industry has sustained—or is threatened with—material injury. *Id.* § 1673b(a)(1)(A). After the conclusion of the investigations, assuming final determinations of dumping and material injury or threat of material injury, Commerce issues an antidumping duty order covering the appropriate imported merchandise. *Id.* § 1673d(c)(2). In its final determination, Commerce defines the scope of products that are subject to the antidumping order. *Walgreen*, 620 F.3d at 1352.

When "[i]ssues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation," Commerce is called upon to inquire into the scope of an

order and "issue[] 'scope rulings' that clarify the scope of an order or suspended investigation with respect to particular products." 19 C.F.R. § 351.225(a). The inquiry that Commerce conducts in a scope ruling is governed by the regulation set forth at 19 C.F.R. § 351.225(k), which provides, in relevant part:

> (k) [I]n considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account the following:
>
>> (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission.

*Id.* at § 351.225(k). "Consequently, a scope ruling is a highly fact-intensive and case-specific determination." *King Supply Co.*, 674 F.3d at 1345.

In our review of Commerce's Final Determination, we reapply the same "substantial evidence" standard of review that the Court of International Trade applied to its review of Commerce's determination. *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1378 (Fed. Cir. 2007). Thus, we uphold Commerce's determination unless it is unsupported by substantial evidence on the record or is not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997). We grant significant deference to Commerce's interpretation of a scope order and we will affirm Commerce's scope ruling unless the record lacks "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films*

*USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Commerce may not, however, interpret the scope of an order contrary to the order's terms or in such a way so as to change the scope of the order.  *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1095 (Fed. Cir. 2002).

## II.

On appeal, GCG reiterates the arguments made below and contends that the only reasonable interpretation of the scope order results in a finding that GCG's product is a blend of PRC citric acid and "other ingredients"— namely non-subject citric acid.  GCG also contends that Commerce's interpretation impermissibly expands the scope of the order.  For the reasons stated below, both arguments lack merit.

GCG's interpretation of the scope of the Orders— that GCG's product is a "blend[] with other ingredients, such as sugar"—depends on a finding that the scope order unambiguously draws a distinction between "subject merchandise"—citric acid, sodium citrate, and potassium citrate from PRC—and non-subject merchandise— anything and everything else.  In support of this argument, GCG points to the Petitioners' explanation for changes made to the scope of the Orders in response to an inquiry regarding the inclusion of "blends of citric acid or certain citrate salts."  J.A. 26-7.  Petitioners stated that, with the addition of the sentence referencing blends of citric products, the scope of the Orders:

> [N]ow specifically includes both blends of citric acid, sodium citrate, and potassium citrate (the latter two hereinafter referred to as "citrate salts," and subject merchandise collectively referred to as "citric products"), as

well as blends with other ingredients in which one or more of the citric products represent the predominant ingredient, by weight or commercial value.

J.A. 27. This language, according to GCG, evidences a concern over blending subject citric products (as defined above) with other subject citric products but not over the blending of subject citric products with non-subject merchandise (including non-subject citric acid, sodium citrate, and potassium citrate). Thus, GCG's argues that the non-subject citric acid in GCG's product is properly understood as an "other ingredient" and the unblended subject citric acid from PRC constitutes less than 40% of the blend.

GCG's interpretation of the Orders is not entirely frivolous. The language added by the Petitioners arguably refers to blends of subject citric products with other subject citric products. We owe significant deference to Commerce's interpretation of a scope order, however, and must evaluate Commerce's position with that standard of review in mind. *See, e.g.*, *Dupont Teijin Films*, 407 F.3d at 1215.

Commerce and Petitioners argue on appeal that GCG arrives at its interpretation of the Orders only by conflating the requirements that subject merchandise be both the type of product specified in the scope order and that it originate from the covered country. *See, e.g.*, *Ugine & ALZ Belg., N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2007) ("For merchandise to be subject to an order, it must meet both parameters, i.e., product type and country of origin.") (citations omitted). Thus, according to Commerce, if a product fails to meet either parameter, it is not within the scope of the order. Because "originating from the PRC" is already a requirement for a product to be properly within the scope of the order, Commerce sees no justification for reading "from PRC" into various clauses of the scope order.

Under Commerce's interpretation, the Orders clearly identify two types of blends within the scope of the Orders: blends of citric acid, sodium citrate, and potassium citrate; and blends with other ingredients. While Commerce initially treated GCG's citric acid as the first type of blend—as a blend on multiple citric products—none of the parties now contend that GCG's citric acid is a blend with other citrates. According to Commerce, the second type of blend contemplates blends of citric acid with "other" ingredients. In their view, the juxtaposition of "other" in the second clause and the three named citric products in the first clause indicates not only that the second clause does not refer to blends of different types of citric products but also that it does not refer to blends of citric acid with itself. The inclusion of "sugar" as an example of an "other" ingredient is strong evidence, moreover, that "other" ingredients are low value, non-citric products. And, as Commerce correctly notes, GCG acknowledges that its product is indistinguishable from pure citric acid and is classifiable under item 2918.14.0000 of the HTSUS, the classification for citric acid, not under HTSUS item 3824.90.9290, the classification for blends. While we agree with GCG that HTSUS headings are not dispositive for purposes of interpreting a scope order and determining how a particular product should be treated by Commerce, they are certainly probative of whether a particular interpretation is reasonable. *Novosteel SA v. United States*, 284 F.3d 1261, 1270 (Fed. Cir. 2002) ("[R]eference to an HTSUS number is not dispositive about the scope of an antidumping or countervailing-duty order.") (citations omitted).

Here, Commerce's interpretation of the scope of the Orders is reasonable. GCG has pointed to no evidence that the Petitioners intended the second sentence covering blends to refer to products that are pure citric acid, but are simply citric acid from multiple sources. And Commerce's interpretation of the first sentence already

accomplishes what GCG asks of it:  namely, only the portion of the acid that is from the PRC is being held as subject to the applicable duty.  We therefore agree with the Court of International Trade that Commerce's determination that GCG's acid is more akin to a commingling of acid rather than a "blend" is a reasonable one.

GCG also argues that Commerce's interpretation impermissibly expands the scope of the Order by failing to incorporate a reference to the country of origin for the subject merchandise.  *See, e.g.*, *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) ("Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms.").  According to GCG, by not reading in the phrase "from the PRC" after each reference to "citric acid, sodium citrate, and potassium citrate" in the scope of the Orders, the Orders arguably cover non-subject merchandise such as citrate products from other countries.  We disagree and fail to see how Commerce's interpretation expands the scope of the Orders beyond its plain terms.  In fact, Commerce's application of the Orders here, assessing a duty on GCG's product "according to the rates applicable to citric acid from both the PRC and any other country represented in the blend, based upon the quantity and value of citric acid from each country included in the blend," evidences that Commerce's interpretation appropriately accounts for both the physical scope of the product as well as the country of origin.[2]  *See* J.A. 39.

CONCLUSION

For the reasons stated above, we find Commerce's interpretation of the scope of the Orders to be reasonable

---

[2]  GCG does not challenge Commerce's findings regarding the country of origin.

and, given the deference we show to Commerce's interpretations, the ruling of the Court of International Trade is

**AFFIRMED.**