# United States Court of Appeals for the Federal Circuit

———————————

**BELL SUPPLY COMPANY, LLC,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**BOOMERANG TUBE LLC, TMK IPSCO TUBULARS, V & M STAR L.P., WHEATLAND TUBE COMPANY, MAVERICK TUBE CORPORATION, UNITED STATES STEEL CORPORATION,**
*Defendants-Appellants*

———————————

2017-1492, 2017-1495, 2017-1504

———————————

Appeals from the United States Court of International Trade in No. 1:14-cv-00066-CRK, Judge Claire R. Kelly.

———————————

Decided: April 25, 2018

———————————

DONALD CAMERON, JR., Morris, Manning & Martin, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by EUGENE DEGNAN, MARY HODGINS, JULIE MENDOZA, BRADY MILLS, R. WILL PLANERT.

JOHN W. BOHN, Schagrin Associates, Washington, DC, argued for defendants-appellants Boomerang Tube LLC,

TMK IPSCO Tubulars, V & M Star L.P., Wheatland Tube Company.  Also represented by ROGER BRIAN SCHAGRIN, CHRISTOPHER CLOUTIER, PAUL WRIGHT JAMESON.

    ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for defendant-appellant Maverick Tube Corporation.  Also represented by ALAN H. PRICE, TESSA V. CAPELOTO, ADAM MILAN TESLIK.

    JOSEF ANSORGE, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, argued for defendant-appellant United States Steel Corporation.  Also represented by DEBBIE LEILANI SHON, JONATHAN GORDON COOPER, KELSEY RULE.

————————————

    Before LOURIE, CHEN, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

    Boomerang Tube LLC, TMK IPSCO Tubulars, V & M Star L.P., Wheatland Tube Company, Maverick Tube Corporation, and United States Steel Corporation (collectively, Domestic Steel Companies) appeal the U.S. Court of International Trade's final judgment in favor of Bell Supply Company, LLC.  The Trade Court affirmed the U.S. Department of Commerce's determination that certain imported oil country tubular goods (OCTG), fabricated as unfinished OCTG in the People's Republic of China and finished in other countries, were not subject to the antidumping and countervailing duty orders covering OCTG imported from China.  The Trade Court also affirmed Commerce's determination that OCTG finished in third countries do not meet the requirements for circumvention under 19 U.S.C. § 1677j.  Because we conclude that the Trade Court improperly proscribed Commerce from using the substantial transformation analysis to determine the country of origin for imported OCTG, we

vacate the Trade Court's decision and remand for further proceedings.

I

The Tariff Act of 1930, as amended, allows Commerce to impose antidumping and countervailing duties on merchandise from foreign countries. 19 U.S.C. §§ 1671, 1673. Antidumping duties (AD) provide relief from market distortions caused by foreign producers who sell their merchandise in the United States for less than fair market value, whereas countervailing duties (CVD) seek to address government subsidies to foreign producers. *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1368 (Fed. Cir. 2002).

An AD or CVD investigation typically starts with a petition filed by a domestic industry. During the investigation, Commerce determines whether the subject merchandise is being sold for less than fair value or has been subsidized by foreign governments. *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002). The U.S. International Trade Commission determines whether "the imported merchandise in question either materially injures or threatens to materially injure American domestic industry." *Allegheny*, 287 F.3d at 1368. Commerce will issue an AD or CVD order if the investigation reveals dumping or foreign subsidies that injure American domestic industry. *Duferco Steel*, 296 F.3d at 1089.

After Commerce issues an AD or CVD order, questions may arise about the scope of the order. To resolve these questions, Commerce conducts scope inquiries to clarify which goods are subject to its AD and CVD orders. 19 C.F.R. § 351.225(a). Commerce has established factors under 19 C.F.R. § 351.225(k) for determining whether specific articles fall within the scope of an existing order.

This appeal involves Commerce's scope inquiry regarding AD and CVD orders covering OCTG from China.

OCTG are steel pipes and tubes used in oil drilling. To make OCTG, steel is first made into "green tube," which is a steel tube that must be finished before it can meet specifications for oil and gas well applications. The finishing process for green tubes typically includes heat treatment, threading, coating, and other processes.

In 2010, Commerce issued AD and CVD orders (the Orders) on OCTG from China. The scope of the Orders is defined as follows:

> The scope of this order consists of certain OCTG . . . whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

Certain Oil Country Tubular Goods from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 75 Fed. Reg. 28,551–54 (May 21, 2010).

Subsequently, U.S. Customs and Border Protection (Customs) determined that OCTG made with unfinished OCTG from China, but finished in Korea or Japan, had a country of origin of Korea or Japan. In particular, Customs noted that "heat treating has been held to substantially transform green tubes into oil well tubing." J.A. 533. This decision prompted several domestic steel companies to ask Commerce to clarify whether the scope of the Orders cover finished OCTG made from "green tubes" produced in China, but finished in another country.

In response to this request, Commerce issued a Final Scope Ruling in February 2014 (the 2014 Scope Ruling),

which found that OCTG finished in third countries are still within the scope of the Orders. In reaching this conclusion, Commerce applied the substantial transformation analysis. But contrary to Customs' decision, Commerce determined that green tubes are not substantially transformed during the finishing process, even if that process includes heat treatment. Accordingly, Commerce ruled that OCTG finished in third countries from Chinese green tubes are still subject to the Orders.

Bell Supply is a U.S. steel importer that purchases green tubes from China and arranges for them to be heat treated and finished in Indonesia. It challenged Commerce's 2014 Scope Ruling at the Trade Court and argued that the scope of the Orders should not extend to OCTG imported from third countries like Indonesia, even if they are made from green tubes produced in China. Bell Supply noted that the language of the Orders does not include OCTG imported from Indonesia, and argued that Commerce cannot use the substantial transformation analysis to sweep in OCTG from Indonesia. Instead, Bell Supply argued that Commerce must conduct a circumvention inquiry under 19 U.S.C. § 1677j before it can impose AD or CVD on products imported from countries not specifically identified in the Orders.

The Trade Court agreed with Bell Supply and found that Commerce failed to properly interpret the Orders in its 2014 Scope Ruling. The Trade Court emphasized that, because "the words of an order must serve as a basis for the inclusion of merchandise within the scope of the order," merchandise is outside an order unless the words of the order support its inclusion. J.A. 17–18.

The Trade Court also held that Commerce should not have applied the substantial transformation analysis to evaluate whether OCTG imported from Indonesia was within the scope of the Orders. The court noted that the circumvention inquiry under § 1677j provides a specific

standard for determining whether foreign producers are trying to evade AD or CVD orders by completing or assembling merchandise in third countries.  Thus, if Commerce believed that importers were circumventing the Orders by finishing green tubes in third countries like Indonesia, then "Commerce must apply the statute Congress enacted for that purpose and must satisfy the enumerated requirements within the statute."  J.A. 22.  Accordingly, the Trade Court issued a remand to Commerce to "identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries."  J.A. 35.

On remand, Commerce again found the Orders cover OCTG made from Chinese green tubes, even if they are finished in a third country.  But this time, Commerce sought to rely on the language of the Orders instead of the substantial transformation analysis.  Its decision reasoned that

> Both unfinished OCTG and finished OCTG are in-scope merchandise; that is, they are both "OCTG" within the plain meaning of the scope language. Therefore, contrary to Bell Supply's arguments, the plain language of the scope of the Orders expressly covers unfinished Chinese OCTG, and that language can reasonably be interpreted to include unfinished OCTG, even when finished in a third country.  The process of finishing does not remove the product from the plain language of the scope, which includes both unfinished and finished OCTG.

J.A. 3298.  Bell Supply again appealed Commerce's Redetermination Pursuant to Remand to the Trade Court.

On appeal, the Trade Court found that Commerce still erred in its interpretation of the Orders.  The court observed that "[t]he scope language makes no mention of whether green tubes manufactured in China remain

subject to the Orders even if the green tubes undergo further processing in a third country. Commerce has not identified any specific language from the Orders that supports such a broad reading of the scope." J.A. 56. Because the Orders do not address third country processing, "Commerce cannot use its failure to expressly include third country processing in writing the scope of the Orders and rely upon its own silence to further support its current interpretation." J.A. 59. The Trade Court remanded to Commerce for a second redetermination.

In the Final Results of Second Redetermination Pursuant to Remand, Commerce concluded that OCTG finished in third countries are not subject to the Orders. In doing so, Commerce relied on the factors under 19 C.F.R. § 351.225(k). Applying these factors, Commerce found "no information under a . . . § 351.225(k)(1) analysis to indicate that OCTG finished in third countries is subject to the scope of the . . . Orders." J.A. 3348. Nor did the factors under 19 C.F.R. § 351.225(k)(2) "indicate whether OCTG finished in third countries falls within the Orders." J.A. 3348. Thus, Commerce found that the language of the Orders does not cover OCTG finished in third countries.

Commerce also concluded that OCTG made with green tubes from China do not meet the standards for circumvention under § 1677j. Commerce determined that "the process of assembly or completion performed . . . in Indonesia is neither minor nor insignificant." J.A. 3362. Instead, the finishing process adds significant value to the final value of the finished OCTG. Accordingly, Commerce found that OCTG imported from Indonesia cannot meet the requirements for circumvention.

The Domestic Steel Companies appealed Commerce's scope ruling to the Trade Court, which sustained the results of Commerce's Second Redetermination. Applying the same reasoning from its earlier decisions, the court

concluded that the language of the Orders does not include OCTG finished in third countries. The court also found that Commerce properly concluded that OCTG finished in third countries do not meet the requirements for circumvention under § 1677j.

The Domestic Steel Companies appeal the Trade Court's decision affirming Commerce's Final Results of Second Redetermination Pursuant to Remand. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

In reviewing the Trade Court's decision, "we step into the shoes of the [Trade Court] and apply the same deferential 'substantial evidence' standard of review that it applied to its review of Commerce's determination." *Walgreen Co. of Deerfield, Il. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010). We uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013).

## A

We start by addressing the Domestic Steel Companies' argument that the imported OCTG can be considered unfinished OCTG from China. Domestic Steel companies contend that "[f]rom the time the green tubes left the factory gates in China to the time the processed products entered the United States, they were [covered] OCTG." Maverick Tube Corp. Br. 29–30; *see also* U.S. Steel Corp. Br. at 15–18. We disagree. The imported merchandise is indisputably *finished* OCTG, and cannot be categorized as unfinished OCTG.

AD and CVD orders only encompass merchandise identified in the language of the Order. *Duferco Steel*, 296 F.3d at 1097. In *Duferco Steel*, we held that Commerce can only include an imported article within the scope of

an AD or CVD order based on the actual language of the order, not on the absence of exclusionary language. *Id.* In that case, the Trade Court had found that AD and CVD orders covered an imported article because "no language in the . . . final orders explicitly" excluded the article. *Id.* at 1089. We reversed, and explained that "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Id.* at 1096.

In this case, the imported merchandise cannot be categorized as unfinished OCTG under the Orders because they are brought into the United States as finished OCTG. Domestic Steel Companies argue the merchandise can still be categorized as unfinished OCTG because that is how it left China, and the Orders do not require the unfinished OCTG to be "directly imported." But the absence of a direct importation requirement does not expand the scope of the Orders. The merchandise at issue is unquestionably finished OCTG, and the language from the Orders directed to unfinished OCTG from China cannot be read to include a different product altogether.

B

We next consider whether the merchandise can be considered *finished* OCTG *from China.* There is no dispute that the products are finished in Indonesia before being imported to the United States, and the Orders do not include OCTG from Indonesia. The parties disagree on the framework for determining whether AD or CVD orders include products finished in a country that is not identified in the orders. Domestic Steel Companies argue that Commerce is entitled to rely on the substantial transformation analysis to determine country of origin for imported articles during scope inquiries. Conversely, Bell Supply contends the substantial transformation analysis would improperly expand the scope of the Orders. Instead, Bell Supply argues that products finished in third

countries are only subject to AD or CVD orders if Commerce finds circumvention under § 1677j.

Both the substantial transformation analysis and the circumvention inquiry can apply to imported products that are made in one country, but finished or assembled in a different country. In general, the substantial transformation analysis is used to determine country of origin for an imported article. *E.I. Du Pont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (Ct. Int'l Trade 1998). A substantial transformation occurs where, "as a result of manufacturing or processing steps . . . [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999). To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment. J.A. 3234–42.

Separate from the substantial transformation analysis, § 1677j provides an anti-circumvention provision that prevents importers from avoiding AD or CVD orders by routing their merchandise through a third country. Section 1677j(b) applies to "merchandise imported into the United States [that] is of the same class or kind as any merchandise produced in a foreign country that is the subject of" an AD or CVD order, but is assembled or completed in a third country not subject to the order. To include such merchandise within the scope of an order, Commerce must determine that (1) "the process of assembly or completion in the foreign country . . . is minor or insignificant," (2) the value added in the country subject to the AD and CVD order is a significant portion of the total value of the merchandise, and (3) "action is appro-

priate under this paragraph to prevent evasion of such order or finding." § 1677j(b)(1)(C)–(E).

We conclude that Commerce is entitled to use the substantial transformation analysis to determine country of origin before resorting to the circumvention inquiry. Where an imported article is "from" can be an inherently ambiguous question. Because a single article can be assembled from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries. To that end, "[t]he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." *E.I. Du Pont*, 8 F. Supp. 2d at 858. Accordingly, even though the imported OCTG was finished in Indonesia, it can still be considered "from China" if the finishing process in Indonesia did not substantially transform the product. This inquiry into where imported articles are "from" necessarily precedes the circumvention inquiry. Circumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders.

We have noted that "the substantial transformation test is recognized and well-established in cases involving country of origin determinations." *Target Sportswear, Inc. v. United States*, 70 F.3d 604, 605 (Fed. Cir. 1995). Our conclusion is consistent with the reasoning of the Trade Court's prior decisions, which have approved of Commerce's reliance on the substantial transformation analysis for merchandise finished in countries identified by the AD or CVD order, but produced with components from a third country. *See, e.g.*, *Appleton Papers Inc. v. United States*, 929 F. Supp. 2d 1329, 1335–36 (Ct. Int'l Trade 2013); *Advanced Tech. & Materials Co. v. United States*, No. 09-00511, 2011 WL 5191016, at *5 (Ct. Int'l

Trade Oct. 12, 2011).  In *Appleton*, the Trade Court explained that "Commerce's decision to conduct a country of origin analysis was reasonable," and upheld "the substantial transformation analysis as a means of determining the country of origin of merchandise produced in multiple countries."  929 F. Supp. 2d at 1335–36.  Likewise, the Trade Court also sustained Commerce's substantial transformation analysis in *Advanced Technology & Materials*, where the court emphasized that "the determination of where the merchandise is produced or manufactured is a fundamental step in the administration of the antidumping laws."  2011 WL 5191016, at *4.

In this case, however, the Trade Court concluded that "[a] country of origin analysis utilizing the substantial transformation test could only be applicable, if at all, where the circumvention test of § 1677j(b) could not apply."  J.A. 29.  According to the Trade Court, § 1677j was inapplicable in cases like *Appleton* because the statute does not address a situation where merchandise is completed in the country subject to AD or CVD orders.  By contrast, the Trade Court held that "[t]he circumvention analysis under § 1677j(b) is the required statutory framework for analyzing the scope of an order when the merchandise is completed or assembled in third countries from subject merchandise or components produced in the subject country."  J.A. 29.  Here, because the imported OCTG was finished in a third country, the Trade Court concluded that § 1677j forecloses Commerce from relying on the substantial transformation analysis.

We disagree with the Trade Court's distinction between products finished in countries subject to AD or CVD orders, and products finished in third countries.  In either scenario, Commerce is entitled to use the substantial transformation analysis to determine whether an imported article is covered by AD or CVD orders in the first instance.  If the article originates from a country identified in the order, then Commerce need not go any

further.  *See Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d 1389, 1399 (Ct. Int'l Trade 2014) (explaining that Commerce's authority was limited to two sources: "the scope language of the Order itself . . . and 19 U.S.C. § 1677j(b)").   On the other hand, if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under § 1677j.

The Trade Court also found that allowing Commerce to rely on the substantial transformation analysis "would render § 1677j superfluous" because the substantial transformation test is "an agency-created device to achieve the same purpose." J.A. 30.  Echoing the court's reasoning, Bell Supply contends that if Commerce were allowed to apply the substantial transformation analysis, then it would be "impossible to envision" a circumstance where Commerce could determine that third country processing results in a substantial transformation, but nevertheless meets the requirements for a finding of circumvention under § 1677j.  Appellee Br. 39.

Contrary to the Trade Court's reasoning, allowing Commerce to apply the substantial transformation analysis for scope inquiries would not render § 1677j superfluous.   Although the substantial transformation and circumvention inquiries are similar, they are not identical.  The substantial transformation test asks whether, as a result of manufacturing or processing, the product "loses its identity and is transformed into a new product having 'a new name, character and use.'" *Bestfoods*, 165 F.3d at 1373 (quoting *United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267, 273 (1940)).  However, even if a product assumes a new identity, the process of "assembly or completion" may still be minor or insignificant, and undertaken for the purpose of evading an AD or CVD

order. For example, in its notice of supplemental authority, Appellant Maverick Tube Corporation notes that hot-rolled steel or cold-rolled steel from China can be "substantially transformed" when it is processed into corrosion-resistant steel in Vietnam. *See, e.g.*, *Bell Supply Co. LLC v. United States*, No. 2017-1492, Dkt. 103 (Fed. Cir. Dec. 11, 2017). Nevertheless, Commerce applied § 1677j to preliminarily determine that imported corrosion-resistant steel products from Vietnam circumvented AD and CVD orders directed to steel products from China. *Id.* at 24–33. Thus, even where an article is substantially transformed, Commerce can still find that it is subject to an AD or CVD order after conducting a circumvention inquiry.

Nor do we believe that Congress enacted § 1677j to preclude Commerce from making a country of origin determination in scope inquiries. Bell Supply contends that Congressional "intent would be frustrated if Commerce is permitted to include within an order merchandise completed or assembled in a third country that does not meet the criteria established in section 1677j." Appellee Br. 42. The legislative history of § 1677j, however, says nothing about limiting Commerce's ability to determine the country of origin for imported products.

To the contrary, legislative history indicates that § 1677j can capture merchandise that is substantially transformed in third countries, which further implies that § 1677j and the substantial transformation analysis are not coextensive. In the Conference Report accompanying the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988), Congress explained that § 1677j addresses situations where "parts and components . . . are sent from the country subject to the order to the third country for assembly or completion." H.R. Rep. No. 100-576, at 600 (1988). Likewise, the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, Pub. L. No. 103-465,

108 Stat. 4809 (1994), describes how foreign exporters will attempt to "circumvent an antidumping duty order by . . . [p]urchasing as many parts as possible from a third country" and assembling them in the United States. H.R. Doc. No. 103-316, at 893 (1994). Assembling off-the-shelf electronic components may very well create a new product that is "from the U.S." or a third country, but such assembly could still be relatively minor and undertaken with the intention of evading AD or CVD orders. We believe that § 1677j is meant to address these attempts at circumvention, not preclude Commerce from making a country of origin determination in the first instance.

## III

For the reasons above, we conclude that Commerce may rely on the substantial transformation analysis to determine whether the imported OCTG can be considered from China. Accordingly, we vacate the Court of International Trade's Decision to Sustain Commerce's Second Remand Results. We remand the case to the Trade Court to determine whether Commerce properly applied the substantial transformation analysis.

**VACATED AND REMANDED**