Slip Op. 25-18

# UNITED STATES COURT OF INTERNATIONAL TRADE

ASIA WHEEL CO., LTD.,

        Plaintiff,

  and

ZC RUBBER AMERICA INC.,

        Plaintiff-Intervenor,

  v.

UNITED STATES,

        Defendant,

  and

ACCURIDE CORP.,

        Defendant-Intervenor.

Before: Gary S. Katzmann, Judge
Court No. 23-00143

## OPINION

[ Plaintiffs' Motion for Judgment on the Agency Record is denied.]

Dated: February 21, 2025

Jay C. Campbell, White & Case LLP, of Washington, D.C., argued for Plaintiff Asia Wheel Co., Ltd. With him on the briefs were Walter J. Spak and Chunfu Yan.

Jing Zhang, Mayer Brown LLP, of Washington, D.C., argued for Plaintiff-Intervenor ZC Rubber America, Inc.

Stephen C. Tosini, Senior Trial Counsel, and Danielle V. Cossey, Of Counsel, U.S. Department of Justice, Washington, D.C., argued for Defendant the United States. With them on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director, and Ian A. McInerney, Senior Attorney, U.S. Department of Commerce.

Nicholas J. Birch, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor Accuride Corp. With him on the briefs was Roger B. Schagrin.

Katzmann, Judge:    This case arises from the U.S. Department of Commerce's ("Commerce") ruling that certain truck wheels produced by Asia Wheel Co., Ltd. ("Asia Wheel") fall within the scope of the antidumping and countervailing duty orders on certain steel trailer wheels from the People's Republic of China ("China").    In May 2019, Commerce issued antidumping and countervailing duty orders on certain steel wheels from China that included as subject products: "certain on-the-road steel wheels, discs, and rims," including "rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China." Certain Steel Wheels from the People's Republic of China: Antidumping and Countervailing Duty Orders, 84 Fed. Reg. 24098, 24100 (Dep't Com. May 24, 2019) ("Orders").

In response to Asia Wheel's request for scope proceedings, see Letter from White and Case LLP to Com., re: Request for Scope Ruling for Asia Wheel's Steel Truck Wheels (Feb. 11, 2021), P.R. 1 ("Scope Ruling Request"), Commerce determined in a scope ruling that Asia Wheel's steel truck wheels, manufactured in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country, are subject to the Orders.  See Mem. from J. Pollack to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. June 7, 2023), P.R. 79 ("Final Scope Ruling").  Plaintiff Asia Wheel, a Thai subsidiary of a Chinese steel wheel Manufacturer, and Plaintiff-Intervenor ZC Rubber America Inc., a U.S. importer of the subject merchandise ("ZC Rubber") challenge Commerce's Final Scope Ruling.  See Pl.'s Am. Mot. for J. on Agency R., Feb. 22, 2024, ECF No. 35 ("Pl.'s Br."); Pl.-Inter.'s Mot. for J. on Agency R., Feb. 13, 2024, ECF No. 31 ("Pl.-Inter.'s Br."); Pl.'s

Reply Br., June 18, 2024, ECF No. 46; Pl.-Inter.'s Reply Br., July 2, 2024, ECF No. 47; Orders, 84 Fed. Reg.; Final Scope Ruling.  Defendant the United States ("the Government") and Defendant-Intervenor Accuride Corporation ("Accuride") ask the court to sustain Commerce's determination.  See Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., Apr. 30, 2024, ECF No. 42 ("Gov't Br."); Def.-Inter.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., May 14, 2024, ECF No, 43 ("Def.-Inter.'s Br.").

This case presents four issues: (1) whether Commerce impermissibly expanded the scope of the Orders; (2) whether Commerce's determination that Asia Wheel's truck wheels produced from mixed-origin components were not substantially transformed in Thailand is supported by substantial evidence and in accordance with law; (3) whether Commerce's decision to impose duties on the entire imported truck wheel is supported by substantial evidence and in accordance with law; and (4) whether importers lacked adequate notice that the truck wheels produced from mixed-origin components were covered by the Orders such that Commerce impermissibly directed U.S. Customs and Border Protection ("Customs") to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry.  The court concludes that (1) Commerce did not impermissibly expand the scope of the Orders; that (2) Commerce's determination that Asia Wheel's truck wheels were not substantially transformed is supported by substantial evidence and in accordance with law; that (3) Commerce's imposition of duties on the entire wheel based on a substantial transformation analysis is supported by substantial evidence and in accordance with law; and that (4) Asia Wheel and ZC Rubber had sufficient notice that the wheels were covered by the Orders.  Therefore, the court denies Asia Wheel's motion and sustains the Final Scope Ruling.

**BACKGROUND**

### I.      *Legal Background*

### A.      *Antidumping and Countervailing Duties and Scope Determinations*

To facilitate fair trade, the Tariff Act of 1930 "permits Commerce to impose two types of duties on imports that injure domestic industries[.]"  Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014) (citing 19 U.S.C. §§ 1671(a), 1673).  Commerce assesses antidumping duties on foreign goods if it determines that the "merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the U.S. International Trade Commission separately concludes that dumping materially injures, threatens, or impedes the establishment of an industry in the United States.  19 U.S.C. § 1673; see also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).  Similarly, Commerce imposes countervailing duties if it determines that a good is receiving a "countervailable subsidy" from a foreign government.  19 U.S.C. § 1671(a).

The duty orders that Commerce issues must "include[] a description of the subject merchandise, in such detail as [Commerce] deems necessary . . . ."  19 U.S.C. § 1673e(a)(2).  Under Commerce's regulations, an interested party may request that Commerce issue a scope ruling to clarify whether a certain article of merchandise is subject to an order.  See 19 C.F.R. § 351.225(a).

### B.      *Substantial Transformation Analysis.*

Antidumping and countervailing orders "must specify both the class or kind of merchandise and the particular country from which the merchandise originates."  Ugine & Alz Belg., N.V. v. United States, 31 CIT 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007) (citing Certain Cold Rolled Carbon Steel Flat Prods. from Arg., 58 Fed. Reg. 37062, 37065 (July 9, 1993)).  In determining country of origin and whether an imported article falls within the scope of an order,

Commerce may conduct a substantial transformation analysis.  See Bell Supply Co. v. United

States, 888 F.3d 1228,1229 (Fed. Cir. 2018) ("Bell Supply IV").[1]  The U.S. Court of Appeals for

the Federal Circuit ("Federal Circuit") has affirmed substantial transformation analysis as "a

yardstick for determining whether the processes performed on merchandise in a country are of

such significance as to require that the resulting merchandise be considered the product of the

country in which the transformation occurred."  Id. at 1229 (quoting E.I. DuPont de Nemours &

Co. v. United States, 22 CIT 370, 373–74, 8 F. Supp. 2d 854, 858 (1998)).  The Federal Circuit

has explained that if a product:

> originates from a country identified in the order, then Commerce need not go any
> further.  On the other hand, if Commerce applies the substantial transformation test
> and concludes that the imported article has a country of origin different from the
> country identified in [the] order, then Commerce can include such merchandise
> within the scope . . . only if it finds circumvention under [19 U.S.C.] § 1677j.

Id. at 1230 (citations omitted).  Ultimately, in conducting a substantial transformation analysis,

Commerce asks whether "as a result of manufacturing or processing, the product 'loses its identity

---

[1] Commerce published revisions to its scope regulations in September 2021, adding a new relevant provision titled "[c]ountry of origin determinations."  19 C.F.R. § 351.225(j)(1).  Under the new provision, Commerce "may use any reasonable method" to "determine the country of origin of the product," to ultimately "consider[] whether a product is covered by the scope of the order at issue . . . ."  Id. § 351.225(j).  The provision goes on to state that "the Secretary may conduct a substantial transformation analysis that considers relevant factors that arise on a case-by-case basis," and includes the factors outlined in Bell Supply IV.  Id. § 351.225(j)(1); see also Bell Supply IV, 888 F.3d at 1228–29.  While this revision codified the substantial transformation test, the parties agree that because Asia Wheel filed its scope ruling request on February 11, 2021, before the effective date of the new regulations, the pre-revision version of the regulations applies.  See Pl.'s Br. at 16 n.2; Def.'s Br. at 9–10 (citing to (k)(1) rather than (j)(1)); see also Scope Ruling Request; Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52300 (Dep't Com. Sept. 20, 2021) ("Amendments to § 351.225 . . . apply to scope inquiries for which a scope ruling application is filed . . . on or after November 4, 2021.").  The parties also agree that substantial transformation was relevant in determining whether a product falls within scope even before Commerce's revision of its scope regulations.  See Pl.'s Br. at 23 (arguing that Commerce applied the wrong standard, but not challenging the use of substantial transformation analysis itself); Def.'s Br. at 15 ("Commerce reasonably decided to apply a substantial transformation analysis to determine country of origin . . . .").

and is transformed into a new product having a new name, character[,] and use.' " Id. at 1228 (internal quotation marks omitted) (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). To determine whether substantial transformation has occurred, "Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Id. at 1228–29.

### C.    Customs's EAPA Investigations.

The Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018), directs Customs to investigate agency referrals or interested-party allegations that "reasonably suggest[] that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1); see also Diamond Tools Tech. LLC v. United States, 45 CIT __, __, 545 F. Supp. 3d 1324, 1331–32 (2021). If Customs determines that covered merchandise entered the United States through evasion, it will suspend liquidation of unliquidated entries "that enter on or after the date of the initiation of the investigation . . . ." 19 U.S.C. § 1517(d)(1)(A)(i). If liquidation of entries has already been suspended, then that suspension will continue. See id. § 1517(d)(1)(A)(ii).

EAPA's purpose is to "empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring full collection of [antidumping and countervailing] duties and, thereby, preventing a loss in revenue." Diamond Tools, 45 CIT at __, 545 F. Supp. 3d at 1351. EAPA establishes the procedure for an "interested party" to submit allegations of importer evasion of antidumping and countervailing liability. 19 U.S.C. § 1517(b). Within fifteen days of a filed

allegation, Customs will open an investigation.  See id. § 1517(b)(1).  Within ninety days, Customs must determine whether there is "reasonable suspicion" of evasion, at which point Customs imposes interim measures, including suspension of liquidation.  Id. § 1517(e).  Next, parties can submit factual information, written arguments, and responses before Customs reaches a final determination.[2]  See 19 C.F.R. § 165.23(b), (c)(2); id. § 165.26(a)(1), (b)(1).  If Customs cannot make a final determination of evasion, it refers the matter to Commerce through a "covered merchandise referral."  19 U.S.C. § 1517(b)(4)(A); 19 C.F.R. § 351.227(a).  Upon receiving the referral, Commerce "shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner."  19 U.S.C. § 1517(b)(4)(B); 19 C.F.R. § 351.227(a).

## II.     Factual Background

On May 24, 2019, Commerce issued antidumping and countervailing orders on imports of certain steel truck wheels from China in response to a petition from Accuride and Maxion Wheels Akron LLC (collectively, "Petitioners").  See Orders, 84 Fed. Reg.  The truck wheels subject to the Orders are used on commercial vehicles including tractors, semi-trailers, dump trucks, garbage trucks, concrete mixers, and buses.  See id. at 24100.  These wheels consist of two components— a rim and a disc—that are welded together.

---

[2] Customs typically must reach this final determination within 300 days of the initiation of the original investigation, though that timeline can be extended in extraordinarily complicated situations.  See 19 U.S.C. § 1517(c)(1).



Steel Truck Wheel Production Process Description and Flowchart at 7 (Feb. 11, 2021), P.R. 1,

C.R. 1, Attach. 4.

> The Orders account for certain types of processing in third countries:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100.

During the original investigation, both Asia Wheel, as an importer of the steel wheels at issue, and Petitioners, as producers of the domestic like product, sought Commerce's clarification on whether the scope includes steel wheels where only one component—that is, a disc—originates in China. See Letter from White & Case LLP to W. Ross, re: Resp. to Pet'rs' Req. for Clarification of Scope of Investigations, Case No. A-570-082, Bar Code: 3789670 (Feb. 4, 2019) ("Zhejiang Jingu's Resp."); Letter from W. Fennell to W. Ross, re: Pet'rs' Req. for Clarification of the Scope of the Investigations and Submission of Additional Factual Information Relevant to Scope, Case No. A-570-082, Bar Code: 3784194 (Dec. 20, 2018). Zhejiang Jingu Company Limited ("Zhejiang Jingu"), a Chinese mandatory respondent and affiliate of Asia Wheel, argued that Chinese-origin rims and discs that are welded and painted in third countries should be considered outside the scope as wheel components that are "substantially transformed" into finished wheels in the third country. See Zhejiang Jingu's Resp. at 2–3. Alternatively, Zhejiang Jingu suggested

that the third-country processing provision was "overly broad and vague, potentially expanding the scope," because it "does not explicitly require that both the rim and disc be produced in China for China to be considered the country of origin." Id. at 6. Thus, Zhejiang Jingu requested clarification and potential language changes to make clear that wheels with only one component from China would not fall within the scope. See id. Commerce declined to conduct a preemptive substantial transformation analysis, noting that:

> "[w]hile in some instances Commerce has relied on substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case. However, here, we find that we can properly frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope . . . ."

Mem. from J. Maeder to G. Taverman, re: Issues and Decision Mem. for the Final Determination of the Less-Than-Fair-Value Investigation of Certain Steel Wheels from the People's Republic of China at 11 (Dep't Com. Mar. 21, 2019), P.R. 1, C.R. 1, Ex. 1 ("Final AD Mem."). Commerce agreed with Zhejiang Jingu that further clarifying language should be included, and subsequently added the qualifier "from China" to provision such that "rims and discs from China that have been further processed in a third country into finished steel wheels be included within scope." Id. at 12.

On February 11, 2021, Asia Wheel requested a scope ruling from Commerce asking whether its truck wheels manufactured in Thailand using discs from China and rims it produced in Thailand from steel plates from China or a third country fall under the scope of the Orders. See Scope Ruling Request at 6.

Customs initiated an EAPA investigation under 19 U.S.C. § 1517 to determine if mixed-component wheels, such as those manufactured by Asia Wheel, evaded the Orders. See Letter from B. Hoxie to N. Birch, re: Notice of Initiation of Investigation and Interim Measures – EAPA Case Number 7509 at 2 (CBP Nov. 23, 2020). Customs was unable to

determine if these wheels were covered merchandise, and on June 9, 2021, issued a "covered merchandise referral" to Commerce under 19 U.S.C. § 1517(b)(4). See Certain Steel Wheels from the People's Republic of China: Notice of Covered Merchandise Referral, 86 Fed. Reg. 38270, 38270–71 (Dep't Com. July 20, 2021).

In response to Asia Wheel's scope request and the covered merchandise referral, Commerce initiated a scope inquiry on May 12, 2021. See Letter from T. Gilgunn to All Interested Parties, re: Initiation of Asia Wheel Scope Inquiry (Dep't Com. May 12, 2021), P.R. 6. Commerce found that the original underlying investigation did not explicitly exclude these wheels produced using mixed-origin components from the scope, and that the Orders are ambiguous as to the inclusion of wheels produced from mixed-origin inputs. See Final Scope Ruling at 9. As a result, Commerce conducted a substantial transformation analysis based on the five factors outlined in Bell Supply IV. See 888 F.3d at 1228–29. Commerce concluded that the finished wheels processed in Thailand are not substantially transformed, and that those wheels' country of origin is therefore China. See Final Scope Ruling at 16–25. On December 13, 2022, Commerce issued a Preliminary Scope Ruling, finding that Asia Wheel's truck wheels manufactured in Thailand are within the scope of the Orders. See Mem. from S. Thompson to J. Maeder, re: Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Dec. 13, 2022), P.R. 59 ("Prelim. Scope Ruling").

Commerce issued its Final Scope Ruling on June 7, 2023, continuing to find that Asia Wheel's truck wheels manufactured in Thailand are in scope. See Final Scope Ruling at 1. Commerce stated that it "intend[ed] to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the Orders of already suspended." Id. at 27.

### III.    *Procedural History*

Asia Wheel brought this action against the Government on August 11, 2023 to challenge Commerce's Final Scope Ruling.  See Compl., Aug. 11, 2023, ECF No. 8.  Plaintiff-Intervenor ZC Rubber and Defendant-Intervenor Accuride moved to intervene in the instant action under USCIT Rule 24, and the court granted both motions.  See Consent Mot. to Intervene as Pl.-Inter., Sept. 1, 2023, ECF No. 15; Order, Sept. 7, 2024, ECF No. 16; Consent Mot. to Intervene as Def.-Inter., Sept. 11, 2023, ECF No. 17; Order, Sept. 12, 2023, ECF No. 21.

On January 30, 2024 and February 13, 2024, respectively, Asia Wheel and ZC Rubber filed a Motion for Judgment on the Agency Record under USCIT Rule 56.2.  See Pl.'s Mot. for J. on the Agency R., Jan. 30, 2024, ECF No. 30; Pl.-Inter.'s Br.  Asia Wheel filed an Amended Motion for Judgment on the Agency Record on February 22, 2024.  See Pl.'s Br.  The Government and Accuride filed their response briefs on April 30, 2024 and May 14, 2024, respectively.  See Gov't Br.; Def.-Inter.'s Br.  Asia Wheel and ZC Rubber filed replies on June 18, 2024 and July 2, 2024 respectively.  See Pl.'s Reply Br.; Pl.-Inter.'s Reply Br.

With all papers filed, the court held oral argument on Wednesday, November 13, 2024. See Order, Sept. 17, 2024, ECF No. 53.  Prior to oral argument, the court issued, and the parties responded to, questions regarding the case.  See Letter re: Qs. for Oral Arg., Oct. 25, 2024, ECF No. 54; Pl.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 58; Pl.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 55; Def.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 56; Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 57.  As directed by the court, the parties also filed briefs following oral argument.  See Def.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 61; Def.-Inter.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 62; Pl. and Pl.-Inter.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 63.

Concurrently with the procedures in this case, the court heard a parallel case, <u>Asia Wheel Co. v. United States</u>, Ct. No. 23-00096 (USCIT filed May 9, 2023) ("<u>Asia Wheel I</u>").  That case involves a relevant prior scope determination, where Commerce considered wheels much like those here: those with components originating in China but where processing culminates in Thailand.  <u>See</u> Mem. from E. Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 8, Case No. A-570-090, Bar Code: 4364599-01 (Dep't Com. Apr. 11, 2023) ("<u>Asia Wheel I</u> Final Scope Ruling").  The court held <u>Asia Wheel I</u> in abeyance pending oral argument in this case.  <u>See</u> Order, <u>Asia Wheel I</u>, Oct. 18, 2024, ECF No. 76.  The opinion in <u>Asia Wheel I</u> is being released concurrently with this opinion.  <u>See</u> Opinion, <u>Asia Wheel I</u>, Feb. 21, 2025, ECF No. 78.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). Section 1516a(b)(1)(B)(i) provides the standard of review: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  <u>Maverick Tube Corp. v. United States</u>, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing <u>Consol. Edison Co. of N.Y. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  This standard requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168

(1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 CIT 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the substantial evidence standard).  Substantial evidence may support Commerce's determination even if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of drawing two inconsistent conclusions from the evidence.'" Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

In issuing scope rulings in particular, Commerce has "substantial freedom to interpret and clarify its antidumping orders," leading to "significant deference in Commerce's interpretation of a scope order." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013). However, the question of whether the scope set out in an original investigation is ambiguous such as to warrant substantial transformation analysis is reviewed by the court de novo.  See Meridian Prods. LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017).

## DISCUSSION

### I.    *Commerce's Interpretation of the Orders Is Supported by Substantial Evidence and in Accordance with Law.*

The text of the Orders here provides that "[t]he scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China." Orders, 84 Fed. Reg. at 24100.  Asia Wheel and ZC Rubber argue that the phrase "rims and discs" unambiguously excludes wheels produced from mixed-origin components, suggesting that the word " 'and' does not mean 'or,' " such that only wheels consisting of both Chinese-origin discs

and Chinese-origin rims fall within the scope. Pl.'s Br. at 17; Pl.-Inter.'s Br. at 12. The Government and Accuride counter that the words "including, but not limited to" in the scope indicate "that the 'welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing," but the "plain language does not address what varieties of processing may otherwise exclude a product from the scope." Gov't Br. at 11 (quoting Final Scope Ruling at 10); Def.-Inter.'s Br. at 6–7. Therefore, the Government contends that the scope does not exclude Asia Wheel's wheels produced from mixed-origin components, and instead reflects that wheels produced from mixed-origin components are covered by the scope if the "processing would not otherwise exclude these items had the processing occurred in China." Gov't Br. at 11 (quoting Final Scope Ruling at 10).

Commerce's interpretation of the scope is supported by substantial evidence and in accordance with law because (1) "rims and discs that have been further processed in a third country" may be reasonably interpreted to include wheels produced from mixed-origin components and because (2) Commerce's later statements only addressed wheels produced from Chinese components such that they did not contradict the earlier interpretation that wheels produced from mixed-origin components fall within the scope of the Orders. Orders, 84 Fed. Reg. at 24100.

### A. Commerce did not err in determining the plain language of the Orders does not exclude Asia Wheel's steel wheels from the scope.

The terms of an order govern its scope. See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) ("[A] predicate for the interpretive process is language in the order that is subject to interpretation."); see also Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071–72 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). The first step in considering whether a product is within the scope of an order is to consider

the language of the order itself. See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012). In analyzing the language of the scope, Commerce may also examine primary interpretive sources such as the descriptions of the merchandise in the petition and in the initial investigation, previous or concurrent determinations of the Secretary, and reports issued pursuant to the initial investigation. See 19 C.F.R. § 351.225(k)(1)(i). If the language of the order unambiguously covers or excludes a product, then that language governs Commerce's inquiry. See 19 C.F.R. § 351.225(k)(1); Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005).

"Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to include it." Duferco Steel, 296 F.3d at 1089. "[A]n interpretation that renders [a term in the scope language] meaningless and mere surplusage," is not reasonable. SMA Surfaces, Inc. v. United States, 47 CIT __, __, 617 F. Supp. 3d 1263, 1275 (2023) (internal quotation marks and citations omitted). Commerce "may reasonably define the class or kind of merchandise in a single set of orders," rather than "engage in a game of whack-a-mole" to specifically include every item of merchandise that could fall within an order in the language of that order. Canadian Solar, Inc. v. United States, 918 F.3d 909, 921–22 (Fed. Cir. 2019). "Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language, but it is not justifiable to identify an ambiguity where none exists." Allegheny Bradford Corp. v. United States, 29 CIT 830, 843, 342 F. Supp. 2d 1172, 1184 (2004) (citing Novosteel SA v. United States, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

The original scope language as laid out at the outset of the antidumping and countervailing investigations included "steel wheels, discs, and rims" imported from China. Certain Steel Wheels from the People's Republic of China: Initiation of Less-Than-Fair Value Investigation, 83 Fed.

Reg. 17798, 17802 (Dep't Com. Apr. 24, 2018). Commerce later modified this scope language to more explicitly include wheels that undergo further processing outside of China. During the investigations, Commerce established that "[t]he scope includes rims and discs that have been further processed in a third country." Final Scope Ruling at 3.[3] While this scope language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as "steel wheels . . . from China," and whose processing "would not otherwise remove the merchandise from the scope of the investigations if performed in [China]." Id. Commerce also

---

[3] In Asia Wheel I, which the court discusses below—a different Final Scope Ruling (which predated the scope ruling now before the court)—the third-country processing provision includes "rims, discs, and wheels that have been further processed in a third country, including, but not limited to, . . . the welding and painting of rims and discs from China," such that Commerce's commentary on the term "rims and discs" clearly refers to its only appearance in the second half of the third-country provision. Asia Wheel I Final Scope Ruling at 6. In contrast, the third-country processing provision here includes only "rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China," such that Commerce's commentary on the term "rims and discs" could refer to its appearance either in the first half of the provision, the second half of the provision, or in both locations. Certain Steel Wheels from the People's Republic of China, 84 Fed. Reg. 11746, 11748 (Dep't Com. Mar. 28, 2019). However, Asia Wheel and ZC Rubber have focused on the phrase "rims and discs" that appears in the second half of the third-country provision, arguing that this language indicates that the rim and disc must both be from China. See Pl.'s Br. at 19 (emphasizing "rims and discs" only in the second half of the provision); id. at 22 (suggesting that the "including, but not limited to" language indicates that the scope may include scenarios of third-country processing of Chinese-origin rims, discs, and wheels); Pl.-Inter.'s Br. at 6 (emphasizing only "rims and discs" in the second half of the provision); Pl.-Inter.'s Resp. to Qs. for Oral Arg. at 1, Nov. 7, 2024, ECF No. 58 ("[T]his difference in wording should not lead to a different result . . . because neither case involves a situation where a Chinese-origin wheel is further processed in a third country.").

Because the Government has interpreted the third country provision in Asia Wheel II to reflect that "rims, discs, and wheels further processed in a third country are covered by the scope," Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 11 (Dep't Com. Dec. 13, 2022), P.R. 59 ("Preliminary Scope Ruling"), and because Asia Wheel and ZC Rubber focus exclusively on the second half of the third-country provision, the court does not address whether Commerce's commentary applies to the same phrase, "rims and discs," in the first half of the third-country provision.

included an example of further processing, noting that this provision "include[s], but [is] not limited to, the welding and painting of rims and discs from China to form a steel wheel." Orders, 84 Fed. Reg. at 24100.

Asia Wheel and ZC Rubber argue that this example, and in particular the phrase "rims and discs from China," indicates that wheels produced from mixed-origin components are unambiguously excluded from the scope. See Pl.'s Br. at 17; Pl.-Inter.'s Br. at 12. However, the phrase "rims and discs from China" comes only after the phrase "including, but not limited to," indicating that "welding and painting of rims and discs from China" constitutes a single, non-exclusive example. The words "including, but not limited to" would be rendered meaningless if Commerce were to interpret the scope to unambiguously exclude wheels produced from mixed-origin components because they are not "rims and discs from China":

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100 (emphasis added); Def.-Inter.'s Br. at 7–8. "The court cannot accept an interpretation that renders [a term in the scope language] meaningless and mere surplusage." SMA Surfaces, 47 CIT at __, 617 F. Supp. 3d at 1275 (internal quotation marks and citation omitted). A single, nonexclusive example of third-country processing that would certainly not remove wheels from the scope still leaves open what other types of third-country processing would similarly not remove the merchandise from the scope of the investigation.

The phrase "including, but not limited to" indicates that there are methods of third country processing that will fall within the scope of the Orders, even if not specifically outlined. Orders, 84 Fed. Reg. at 24100. The above excerpt from the Orders indicates that there are methods of processing that will be within the scope, though Commerce explicitly chose not to enumerate them

all. To rule that any method of processing not explicitly outlined in the Orders is outside the scope would render certain key phrases superfluous. Therefore, this language does not, as Asia Wheel and ZC Rubber argue, indicate that wheels produced from mixed-origin components are unambiguously excluded from the scope.

The plain scope language includes rims, discs, and wheels that have undergone further processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China. While the scope language notes that "welding and painting of rims and discs from China" is further processing that does not remove the merchandise from the scope, the scope language is ambiguous as to what other further processing would not remove the merchandise from the scope. Id. Therefore, Commerce did not err in determining that the scope language does not categorically exclude wheels produced from mixed-origin components.

### B. Commerce's Scope Determination Did Not Change the Scope of the Orders.

Asia Wheel suggests that Commerce "confirmed in the original investigations that wheels manufactured in third countries with only one wheel component—the disc—originating in China are outside the scope." Pl.'s Br. at 18. Thus, Asia Wheel argues, Commerce "recharacterized" its scope analysis from the antidumping and countervailing investigations by concluding that the scope of the Orders is ambiguous. Id. at 20. The Government counters that Commerce declined to modify the scope to expressly include wheels produced from rims or discs from China, but also "did not dictate that such wheels must be held to be out-of-scope." Gov't Br. at 13. Accuride further argues that, while Commerce explicitly included Chinese rims and discs that had been processed in a third country before importation to the United States, Commerce was also "explicit that the coverage was wider than and not limited to that stated example of welding and painting of a rim and disc [from] China." and therefore did not change the scope of the order or alter its express

terms.  Def.-Inter.'s Br. at 6.

"[A] scope determination is not in accordance with law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms."  Allegheny Bradford, 28 CIT at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95); see also Wheatland Tube, 161 F.3d at 1370 ("Although Commerce enjoys substantial freedom to interpret and clarify its antidumping duty orders, it can neither change them, nor interpret them in a way contrary to their terms." (internal quotation marks and citations omitted)).  A clarification of scope language does "not change the scope of the order or alter its express terms."  King Supply Co. v. United States, 674 F.3d 1343, 1351 (Fed. Cir. 2012) (distinguishing Duferco Steel on the ground that Commerce in that case "had impermissibly relied upon language in the petitions rather than the orders to modify the scope of the orders by effectively importing a physical description of certain products that was not present in the text of the order." (citation omitted)).

Commerce's statements during the investigation did not "recharacterize" or change the scope of the Orders, but rather confirmed the scope was ambiguous as to which types of third-country processing would not remove a product from the scope.  Pl.'s Br. at 20; Prelim. Scope Mem. at 9–13; Final Scope Mem. at 7–10.  In refusing to accept suggested revisions, Commerce communicated that during the original investigation it would not address the inclusion of wheels produced from mixed-origin components.  See Final Scope Mem. at 10.  Commerce declined to modify the scope to expressly include wheels manufactured in a third country from rims or discs from China, stating that:

> "[w]hile in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case. However, here, we find that we can properly frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope . . . ."

Final AD IDM at 11. This language confirmed that Commerce deferred the issue of wheels produced from mixed-origin components and noted that further analysis would be necessary on a case-by-case basis.

While Commerce did, as Asia Wheel note, "agree with Zhejiang Jingu that the proposed scope amendment should include further language," this agreement was limited to the addition of the qualifier "from China" to the non-exhaustive example of further processing ("welding and painting"), not to the broader suggestion that the scope only covered wheels where both the rim and the disc were made in China. Final AD Mem. at 12; Pl.'s Br. at 19–20.

The court concludes that Commerce's scope determination that the <u>Orders</u> did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the <u>Orders</u> and with Commerce's statements during the investigations. Therefore, Commerce's scope determination did not "change[] the scope of [the] order or interpret[] [the] order in a manner contrary to the order's terms." <u>Allegheny Bradford</u>, 28 CIT at 843, 342 F. Supp. 2d at 1183 (citing <u>Duferco Steel</u>, 296 F.3d at 1094–95). In lawfully determining that the scope of the <u>Orders</u> was ambiguous as to wheels produced from mixed-origin components, Commerce permissibly proceeded to conduct a substantial transformation analysis.

> II.     ***Commerce's Determination that the Mixed-Origin Components Were Not Substantially Transformed into Thai-Origin Wheels Is Supported by Substantial Evidence and in Accordance with Law.***

Asia Wheel and ZC Rubber argue that Commerce failed to apply the proper legal standard in conducting its substantial transformation analysis, and that Commerce's analysis is unsupported by substantial evidence. <u>See</u> Pl.'s Br. at 23. The court addresses each argument in turn and concludes that (1) Commerce's method of analysis is in accordance with the law, and that (2) Commerce's analysis and subsequent conclusion that Asia Wheels steel wheels were of Chinese origin is supported by substantial evidence.

### A.      Commerce's Five-Factor Method of Analysis Is in Accordance with Law.

Recall that antidumping and countervailing orders apply based on the type of merchandise and the country of origin, and that in determining country of origin, Commerce may conduct a substantial transformation analysis. See Bell Supply IV, 888 F.3d at 1228, 1230. Substantial transformation analysis is a metric to determine "whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (internal quotation marks and citation omitted).

Asia Wheel first contends that Commerce employed the incorrect test in performing its substantial transformation analysis. According to Asia Wheel, the "fundamental question" is whether the Chinese-origin components became "a new product having a new name, character, and use," through Thai processing. Pl.'s Br. at 24 (citing Bell Supply IV, 888 F.3d at 1228 (internal quotation marks and citations omitted)). Instead, Asia Wheel argues, Commerce "had it backwards," employing the five factors noted in Bell Supply IV for determining whether substantial transformation had occurred as the primary test—disconnected from the fundamental question such that its analysis was "meaningless"—rather than using the factors to inform the "name, character, and use" question. See id. at 23 (citing Bell Supply IV, 888 F.3d at 1228–29). The Government contends that Commerce "may consider whether the third[-]country processing imparted 'a new name, character, and use' in consideration of the totality of the circumstances, [but] such findings may not supplant analysis of the record with respect to the" five factor test. Gov't Br. at 19. The Government also argues that implementation of this standard as the "sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot." Id. (citing Bell Supply IV, 888 F.3d at 1228–29).

Commerce's application of the five factors from Bell Supply IV, in analyzing whether the wheel components underwent substantial transformation in Thailand, is in accordance with law. See 888 F.3d at 1228–29. Recall that in Bell Supply IV, the Federal Circuit held that "[a] substantial transformation occurs where, as a result of manufacturing or processing steps . . . [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." Id. at 1228 (internal quotation marks and citation omitted). According to the Final Scope Ruling, Commerce's substantial transformation analysis here asked:

> (1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use; and

> (2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.

Final Scope Ruling at 5 (footnotes omitted).

Thus, while Asia Wheel and ZC Rubber correctly note that whether a product "loses its identity and is transformed into a new product having a new name, character, and use" is relevant to the substantial transformation question here, this is not where the analysis ends. Pl.'s Br. at 28 (quoting Bell Supply IV, 888 F.3d at 1228–29). Recall that the court in Bell Supply IV went on to posit five (nonexclusive) factors for the substantial transformation analysis:

> To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment.

888 F.3d at 1228–29.

Consequently, while a product's "new name, character, and use" may be relevant, the five-factor test is the primary mechanism for determining whether substantial transformation has

occurred.[4]  Additionally, the five-factor test is a "totality of the circumstances" method of analysis such that the factors are not "divorced" from the fundamental question, as Asia Wheel and ZC Rubber allege.  See Venus Wire Indus. Pvt. Ltd. v. United States, 43 CIT __, __, 424 F. Supp. 3d 1369, 1378 n.11 (2019) ("While the formulation of the factors Commerce considers in a substantial transformation test varies slightly across proceedings, in general, Commerce considers [these five factors.]" (citing Bell Supply IV, 888 F.3d at 1228–29)).  Accordingly, Commerce's thorough analysis of the five factors outlined in Bell Supply IV in determining whether Asia Wheel's steel wheels underwent substantial transformation in Thailand is in accordance with law.

### B.      Commerce's Substantial Transformation Analysis Is Supported by Substantial Evidence.

Asia Wheel next suggests that Commerce, in conducting its substantial transformation analysis, considered just one component—the discs—rather than the finished wheels, thus failing to apply the governing legal standard.  See Pl.'s Br. at 28–29.  The Government contends that the court rejected a similar argument in Peer Bearing, where it considered whether unfinished and finished parts from China were substantially transformed into finished products in Thailand.  See Gov't Br. at 21–22 (citing Peer Bearing Co.-Changshan v. United States, 39 CIT 1942, 128 F. Supp. 3d 1286 (2015) ("Commerce was not precluded from taking into consideration the

---

[4] This court previously addressed the Federal Circuit's mention of a "new name, character[,] and use" in Bell Supply IV, noting that "[a]lthough the Court of Appeals quotes Bestfoods to invoke the name, character[,] or use test, Bestfoods involved a North American Free Trade Agreement country of origin determination applying statutory tariff-shift rules as opposed to Gibson-Thomsen's 'name, character[,] and use' test, which evolved in Customs law." Bell Supply Co. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1281, 1287 n.6 (2018) ("Bell Supply V"). The Federal Circuit "[spoke] of the name, character or use test, [but did] not invoke any of the factors used in Customs cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation." Id. Because Commerce itself noted the new name, character, and use question within the Final Scope Ruling, we consider it here just as courts did in Bell Supply IV and V: as merely a framework for the more essential five factors outlined below.

uncontested fact that the [tapered roller bearing] production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to become [tapered roller bearings].")).

While the parties agree that the disc component of the subject merchandise is of Chinese origin, Asia Wheel's characterization ignores Commerce's thorough analysis of the wheel as a whole and the other component of the finished wheel: the rim. The relevant question in Commerce's substantial transformation analysis was not whether the rectangular sheet of steel is substantially transformed when turned into a round rim. Rather, the question was whether both wheel components undergo substantial transformation to become a finished wheel. See Final Scope Ruling at 16–25. Thus, Commerce here asked whether an in-process component (a rim) and a finished component (a disc) are substantially transformed when processed and assembled into a finished wheel. Focusing only on the transformation from steel sheet to finished rim ignores the rest of the processing, much of which takes place in China: for example, the creation of the steel plate and the production of the finished disc. But again, the relevant question was not whether the in-process rim is substantially transformed when processed into a finished rim, but rather whether the in-process rim and finished disc are substantially transformed when processed and assembled into a finished wheel. See id.

Commerce's Final Scope Ruling demonstrates that the agency considered exactly this question at every stage of analysis. Contrary to Plaintiff's contention that Commerce only considered a single component rather than the finished wheel, see Pl.'s Br. at 28–29, Commerce found that: (1) the wheel components and finished wheel are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as the only such component after incorporation into the finished wheel, and (3) the production in China culminates in a complete disc and an in-process rim, functionally creating an already designed

wheel. See Final Scope Ruling at 16–25 (emphasis added). Commerce ultimately concluded that "the finished truck wheels Asia Wheel manufactures in its facilities in Thailand using discs from China and rims it produces in Thailand from steel plates from China or a third country are not substantially transformed such that the third-country processing confers country of origin based on the totality of circumstances." Id. at 16 (emphasis added). This conclusion is supported by substantial evidence, as Commerce thoroughly considered all five factors in analyzing whether the in-process component and the finished component are substantially transformed into a finished wheel in Thailand.

Asia Wheel suggests that Commerce's analysis of the "essential component" factor "further illustrates its flawed approach." Pl.'s Br. at 26. To the extent that this argument serves as an example that Commerce only considered the discs, it fails, as Commerce considered both the components and the finished wheel throughout its analysis. To the extent that this argument raises an independent ground for finding Commerce's substantial transformation analysis to be unsupported by substantial evidence, it also fails, as Commerce extensively considered the properties and end uses of both the rim and the disc and the finished wheel. See Final Scope Ruling at 16–25. In doing so, Commerce noted that, while the essential characteristics of the finished wheel are not established until the rim and disc are assembled, the elements remain the same both before and after assembly. Id. at 19. Commerce found that "any given disc or rim continues to function as the only such component after incorporation into a finished wheel." Id. (quoting Prelim. Scope Ruling at 17). Commerce considered, for example, that the qualities of a disc do not change or transform through processing: the number, placement, and type of bolt holes; the mounting arrangement; and the materials used to produce the disc all remain the same. See id. at 20. Additionally, Commerce noted that the introduction of certain physical characteristics in

Thailand, like the rim's diameter, is merely the finishing of a process that began in China. See id. at 22. This finding is therefore supported by substantial evidence.

### III. Commerce's Decision to Impose Duties on the Entire Wheel Is Supported by Substantial Evidence.

Asia Wheel also argues that Commerce impermissibly expanded the scope contrary to its terms when it determined that the entire wheel is covered by the scope of the Orders when "only one wheel component (a disc) was exported from China." Pl.'s Br. at 2–3, see also id. at 28–29. The Government counters that Asia Wheel begins the inquiry at the wrong point in the analysis, asking the court to determine whether some components of the wheel are not dutiable on their own when it has been determined that the entire wheel is subject merchandise. See Gov't Br. at 22. Accuride further argues that "precedent confirms that Commerce's determination is to the origin of the imported article as a whole, not separately to each of what were only previously separate components." Def.-Inter.'s Br. at 21.

While Asia Wheel is correct that Commerce cannot interpret the scope of the Orders to change the scope or otherwise interpret it contrary to its terms, that is not the case here. See Pl.'s Br. at 28 (citing Eckstrom Indus., 254 F.3d at 1072). Commerce did not change or expand the scope, but merely conducted a substantial transformation analysis to confirm that the wheels here are Chinese and therefore fall within the scope.

Asia Wheel's argument on this point is based on its mischaracterization of Commerce's substantial transformation analysis as concluding that only the disc was of Chinese origin. See Pl.'s Br. at 28–29. As indicated above, this characterization overlooks Commerce's thorough analysis of both components and the finished wheel. Indeed, substantial transformation analysis assesses duty liability for a product assembled from multiple components upon its entry into the United States. See Bell Supply IV, 888 F.3d at 1229 ("Because a single article can be assembled

from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries."). Subsequently, the substantial transformation analysis provides a metric "for determining whether the processes performed on merchandise in a country are of such significance as to require that the <u>resulting merchandise</u> be considered the product of the country in which the transformation occurred." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis added). In conducting substantial transformation analysis, Commerce sought to determine the country of origin for the resulting product as entered into the United States—that is, as an assembled wheel.

Asia Wheel does not provide any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess. To the extent the Asia Wheel suggests Commerce should follow this method separately from conducting a substantial transformation analysis, the suggestion is moot. As Commerce already determined the entire wheel is within scope, it need not assess duties on individual wheel components. Therefore, Commerce's imposition of antidumping and countervailing duties on the entire wheel is supported by substantial evidence.

## IV. *Commerce Permissibly Directed Customs to Continue to Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry.*

Asia Wheel argues that importers did not receive fair warning that trailer wheels produced in third countries from mixed-origin components are subject to the <u>Orders</u> until Commerce initiated the scope inquiry at Asia Wheel's request. <u>See</u> Pl.'s Br. at 30. Thus, Asia Wheel contends, Commerce impermissibly directed Customs to continue its prior suspension of liquidation of imports entered before the date of initiation of the scope inquiry. <u>See id.</u> This direction, according to Asia Wheel, will subject them to millions of dollars in retroactive antidumping and countervailing duties that they could not have anticipated. <u>See</u> Pl.'s Br. at 3. The

Government and Accuride counter that Commerce expressly noted that future merchandise would need to be evaluated on a case-by-case basis.  See Def.'s Br. at 29; Def.-Inter.'s Br. at 23.  Even if Commerce did not provide adequate notice, the Government and Accuride argue, Commerce has no authority to direct the outcome of decisions that Commerce entrusted to Customs.  See Def.'s Br. at 32–34; Def.-Inter.'s Br. at 26; 19 U.S.C. § 1517(b)(1) ("[Customs] shall initiate and investigation    if    [Customs]    determines    that    the    information    provided    in . . . the referral . . . reasonably suggests that the covered merchandise has been entered into the customs territory of the United States through evasion.").

Upon an affirmative scope determination, Commerce will "direct U.S. Customs and Border Protection to continue the suspension of liquidation of previously suspended entries and apply the applicable cash deposit rate until appropriate liquidation instructions are issued . . . ."  19 C.F.R. § 351.225(*l*)(3).  Additionally, Commerce "will direct U.S. Customs and Border Protection to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product not yet suspended . . . on or after the date of initiation of the scope inquiry . . . ."  Id.  Fair notice is particularly important in contexts like this one where importers may be subjected to substantial retroactive liability.   The fair notice requirement reflects the "broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires.'"  Tai-Ao Aluminum Co. v. United States, 983 F.3d 487, 495 (Fed. Cir. 2020) (quoting Mid Continent Nail, 725 F.3d at 1300–01).

Commerce's statements expressly noting that "in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues," but that "the decision to

conduct such an analysis is contingent upon the facts and circumstances of a particular case" served as adequate notice. Final AD IDM at 11. Because Asia Wheel and ZC Rubber had adequate notice, Commerce permissibly directed Customs to continue is prior suspension of liquidation.

### A.    Commerce Provided Lawful Notice That Mixed-Origin Wheels Could Be Subject Merchandise.

An antidumping and countervailing duty order must contain "a description of the subject merchandise, in such detail as the administering authority deems necessary," to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). Adequate notice requires "that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include." Mid Continent Nail, 725 F.3d at 1301 (internal quotation marks and citations omitted). Without adequate notice, "Commerce cannot suspend liquidation of entries entered 'on . . . the date of initiation of the scope inquiry.'" Tai-Ao, 983 F.3d at 490 (quoting 19 C.F.R. § 351.225(*l*)(2)). This notice requirement reflects the "broader due-process principle" that Commerce must provide fair warning to regulated parties before enforcing a penalty or sanction. Id. at 495 (quoting Mid Continent Nail, 725 F.3d at 1300–01).

However, adequate notice is not the same as certainty that a product will or will not fall within the scope of an order. Instead, adequate notice need only allow an importer to reasonably interpret what merchandise is included in the order. Cf. Mid Continent Nail, 725 F.3d at 1301–02 ("The mere fact that the order in this case makes no explicit reference to mixed media items does not conclusively establish that Commerce lacked authority to consider the order's applicability to nails contained within such items."). Notice need not be certain because questions often later "arise as to whether a particular product is covered by the scope of an antidumping or countervailing duty order. Such questions, such as those regarding the country of origin of merchandise, may arise for a variety of reasons given that the description of the merchandise

subject to the scope is written in general terms."  19 C.F.R. § 351.225(a); <u>see also</u> <u>Bell Supply Co.</u>

<u>v. United States</u>, 43 CIT __, __, 393 F. Supp. 3d 1229, 1236 (2019) ("<u>Bell Supply VI</u>") ("Issues

arise regarding whether a product falls within the scope of an [antidumping or countervailing duty]

order, in part because federal regulations require Commerce to write the descriptions in 'general

terms.' ").  As noted above, Commerce may use a substantial transformation analysis to resolve

questions regarding the country of origin of an imported article.  <u>See</u> <u>Bell Supply IV</u>, 888 F.3d at

1229.  The existence of some ambiguity in scope language does not mean that notice is inadequate

as to products requiring substantial transformation to determine country of origin, as it is

impractical to require Commerce to anticipate every type of third-country processing.  <u>Cf.</u>

<u>Canadian Solar</u>, 918 F.3d at 921–22 ("It is unnecessary for Commerce to engage in a game of

whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of

orders, and within the context of a single set of investigations, to include all imports causing

injury.").

      Here, Commerce explicitly included within the scope "rims and discs that have been further

processed in a third country," and provided one type of processing that would certainly be included

(the welding and painting of rims and discs from China).  Final Scope Ruling at 3.  However, by

including "any other processing that would not otherwise remove the merchandise from the scope

of the orders if performed in China," Commerce left open the question of what other types of

third-country processing would not remove the merchandise from the scope.  <u>Id.</u>  While this

language did not explicitly indicate that the exact processing here would be included, <u>see</u> <u>supra</u>

section I.A., it contained the general statement that rims and discs processed in a third country may

be included.

      Even if the scope language itself was not enough to provide adequate notice on its own,

Commerce went further. Commerce stated during the investigation that "in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues," but that "the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Final AD IDM at 11. This statement indicated that particular types of processing would undergo substantial transformation analysis to address country-of-origin issues depending on the specific facts and circumstances. Commerce cannot be expected to anticipate every type of third-country processing, and thus cannot feasibly indicate with certainty every hypothetical product that would fall within the scope. Despite this ambiguity as to specific types of processing, Asia Wheel could anticipate that the wheels at issue fall within Commerce's description and thus are covered by the scope based on the language of the Orders and Commerce's commentary during the investigation. Therefore, Commerce's commentary during the investigation provided further adequate notice that wheels produced from mixed-origin components could be subject merchandise.

Beyond the language and commentary during this investigation, Commerce's commentary in Asia Wheel I, a relevant prior scope determination, provided further notice to the parties in this case. See Mem. from E. Begnal to J. Maeder, re: Certain Steel Wheels from the People's Republic of China: Final Scope Decision Memorandum for the Final Antidumping Duty and Countervailing Duty Determinations, Case No. A-570-090, Bar Code: 3857017 (Dep't Com. July 1, 2019) ("Asia Wheel I Final Scope Memo"); Mem. from E. Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Apr. 11, 2023), P.R. 126 ("Final Scope Ruling"). In Asia Wheel I, Commerce considered wheels much like those here: those manufactured in Thailand using discs from China and rims it produces in Thailand from steel plates sourced from China or a third country. See Asia Wheel I Final Scope Ruling at 8. In fact,

Commerce's commentary in Asia Wheel I is particularly relevant because it interpreted a prior scope ruling involving almost identical antidumping orders, and specifically, a nearly identical third-country processing provision. The antidumping orders in Asia Wheel I contain the following third-country processing provision:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders, 84 Fed. Reg. 45952, 45954 (Dep't Com. Sept. 3, 2019). The Orders in this case contain a substantially similar third-country processing provision:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100. Thus, Commerce's commentary interpreting the third-country processing provision in Asia Wheel I is particularly relevant here. In Asia Wheel I, Commerce interpreted the third-country processing provision while conducting a substantially similar country-of-origin analysis on nearly identical wheels.[5] There, Commerce noted that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Asia Wheel I Final

---

[5] ZC Rubber argues that the differences between the scope language in Asia Wheel I and Asia Wheel II suggest that Commerce's commentary in Asia Wheel I cannot serve as sufficient notice. However, ZC Rubber only points to immaterial differences such as the differences in wheel diameter, and the use for the wheels in Asia Wheel I for road and highway trailers versus the use for the wheels in Asia Wheel II for Class 6, 7, and 8 commercial vehicles. See Pl.-Inter.'s Resp. to Qs. for Oral Arg. at 2–3, Nov. 7, 2024, ECF No. 55. These differences do not suggest that Commerce's ultimate decision would be any different in the two cases, and do not indicate why the statement in Asia Wheel I that Commerce does not foreclose future substantial transformation analysis would not be applicable here.

Scope Memo at 24.  In declining to foreclose this further analysis, Commerce clearly contemplated the exact wheels at issue in Asia Wheel I, which are substantially similar to the wheels at issue in this case such that Asia Wheel and ZC Rubber could reasonably anticipate that the wheels here would fall within the scope of the Orders subject to a substantial transformation analysis.

There is no question that Asia Wheel was aware that the language from Asia Wheel I was instructive here, as Asia Wheel suggested in their scope request that Commerce's interpretation of the scope language in Asia Wheel I is relevant and submitted excerpts of the AD/CVD Orders and the Final Scope Memo from Asia Wheel I as exhibits to their request for a scope ruling.  See Request for Scope Ruling at 5 (Dept. Com. Feb. 11, 2021), P.R. 1; see also Asia Wheel I Final Scope Memo.  Similarly, Commerce's commentary in Asia Wheel I provided additional notice to ZC Rubber, though it was not a named party in that case, because scope determinations are made based on the type of merchandise, not the particular parties.  Therefore, responsible importers should consider publicly available prior scope rulings interpreting antidumping orders on substantially similar merchandise regardless of whether or not they are explicitly named.  See Mid Continent Nail, 725 F.3d at 1304 ("In some cases . . . guidance may be found in the third of the (k)(1) criteria . . . so long as these prior determinations were publicly available at the time that the antidumping order was issued." (footnote omitted)).  Because Commerce's commentary in Asia Wheel I involved substantially similar merchandise, interpreted a nearly identical third-country processing provision, and was publicly available, it provided additional notice to the parties in this case.

Asia Wheel and ZC Rubber had adequate notice that steel wheels produced from mixed-origin components would fall within the scope based on the language of the scope order itself, Commerce's additional commentary during the investigation, and Commerce's commentary

in its prior scope determination in Asia Wheel I.

### B.   *Tai-Ao* and *Trans Texas* Do Not Support Plaintiff's Argument that Commerce Failed to Provide Fair Notice Here.

Asia Wheel provides two cases to support its assertion that Commerce's statements clarifying the original scope did not provide adequate notice. See Tai-Ao Aluminum Co. v. United States, 983 F.3d 487 (Fed. Cir. 2020); Trans Tex. Tire, LLC v. United States, 45 CIT __, 519 F. Supp. 3d 1275 (2021). However, those cases differ in important ways from the present case. In Tai-Ao, Commerce expanded the scope of its inquiry. See 983 F.3d at 495–96. In Trans Texas, Commerce did not suggest the relevant products were included in the scope until the final scope ruling. See 45 CIT at __, 519 F. Supp. 3d at 1281. Those cases are unlike the present case, where a reasonable importer could interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis. See Orders, 84 Fed. Reg. at 24100; Final Scope Ruling at 27–28.

Asia Wheel argues that Tai-Ao "confirms that statements of intent to consider the potential application of antidumping and countervailing duties in the future do not constitute fair warning." Pl.'s Br. at 35. However, the court in Tai-Ao did not hold that a statement of intent can never provide adequate notice, but only that a statement of intent contemplating whether the inquiry should be expanded does not provide adequate notice. Tai-Ao, 983 F.3d at 495. This holding was supported by Commerce's statements and conduct suggesting the scope was limited to a single importer. For example, in Tai-Ao, the Initiation Notice only named one importer, Commerce's explanation for why it initiated the inquiry focused primarily on one importer, and Commerce issued a questionnaire to only one importer. See id. at 495–96. Unlike in Tai-Ao, where the statement of intent contemplated expansion of the scope and contradicted Commerce's other

statements and conduct, Commerce's statement here that it would not conduct fact specific substantial transformation analysis merely clarified the original scope and was consistent with Commerce's other statements and conduct.  Final Scope Mem. at 27–28.  Therefore, unlike in Tai-Ao, Commerce's statement here that it would not foreclose future analysis of wheels produced from mixed-origin components served as adequate notice that wheels produced from mixed-origin components could be included within the scope.

Trans Texas similarly does not support the Asia Wheel and ZC Rubber's argument that Commerce did not provide adequate notice here.  See 45 CIT __, 519 F. Supp. 3d 1275.  In Trans Texas, Commerce expressly excluded certain on-the-road steel wheels that are coated entirely in chrome from its preliminary determination and reiterated this position throughout the investigation.  Id. at __, 1281.  However, Commerce ultimately included PVD chrome wheels in its final scope ruling despite chrome coating.  See id.  While the court confirmed that Commerce can "alter the scope of the investigation until the final order," Commerce did not alter the scope to include PVD chrome wheels until publication of the final scope ruling, and thus did not provide adequate notice until then.  Id. at __, __, 1284; 1288.  This is unlike the present case where wheels produced from mixed-origin components can reasonably be considered within the original scope and where Commerce expressly indicated they might be included subject to a substantial transformation analysis during the initial investigation.  See Final Scope Mem. at 28.

Ultimately, Commerce's initial scope language, Commerce's statements during the investigation the decision to conduct substantial transformation is fact specific, and Commerce's commentary in Asia Wheel I provided Asia Wheel and ZC Rubber with adequate notice that their wheels could reasonably be subject to the Orders.  Because Commerce provided Asia Wheel and

ZC Rubber with adequate notice, Commerce's instructions to Customs to continue its prior suspension of liquidation were proper.

## CONCLUSION

For the reasons stated above, Commerce's determination is supported by substantial evidence and in accordance with law. The court thus denies Asia Wheel's motion and sustains Commerce's Final Scope Ruling. Judgment will enter accordingly.

**SO ORDERED.**

/s/      *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: February 21, 2025
New York, New York